COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker,* Judge Malveaux and Senior Judge Haley
Argued at Fredericksburg, Virginia

**PUBLISHED**

BRAULIO MARCELO CASTILLO, S/K/A
 BRAULIO MARCELLO CASTILLO

OPINION BY
v.      Record No. 0140-17-4      JUDGE MARY BENNETT MALVEAUX
JUNE 4, 2019

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF LOUDOUN COUNTY
Stephen E. Sincavage, Judge

Thomas K. Plofchan, Jr. (Westlake Legal Group, on briefs), for
appellant.

Eugene P. Murphy, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Braulio M. Castillo ("appellant") was convicted of first-degree murder, in violation of Code

§ 18.2-32, burglary with the intent to commit murder, in violation of Code § 18.2-90, and violation

of a protective order, in violation of Code § 16.1-253.2. On appeal, he challenges several of the trial

court's decisions: (1) the denial of his motion to sever the protective order violation and the

admission of the protective order; (2) the refusal to strike Juror Colbert for cause and to properly

examine Juror Anderson; (3) the finding that he waived attorney-client privilege concerning notes

found on his iPhone; (4) the admission of "cadaver dog" evidence; (5) the denial of motions for

mistrial based upon prosecutorial misconduct; (6) allowing for the testimony of a child via

closed-circuit television; (7) the admission of testimony regarding his exercise of his right to remain

silent; (8) the limitation of cross-examination of certain Commonwealth witnesses; (9) the denial of

_____

* On January 1, 2019, Judge Decker succeeded Judge Huff as chief judge.

his motion to set aside the verdict based upon a Brady violation; and (10) the refusal to review notes from an interview *in camera*. Finding no error, we affirm.

## I. BACKGROUND

Appellant and the victim, Michelle Castillo, were married and lived in a home in Ashburn, Virginia. They had four minor children, V.C., J.C., Z.C., and B.C., and an adult child, Nicholas, who lived away from home at college. The victim and appellant separated in March 2013. At that time, the victim petitioned for and was granted a protective order on behalf of herself and the minor children. The order required appellant to "refrain from committing further acts of family abuse." The protective order also gave the victim legal custody of the children and possession of the marital residence. Appellant was allowed to see the children for dinner on Wednesday nights and on every other weekend but was prohibited from entering the residence.

Two to four weeks after entry of the protective order, the victim filed for divorce. She requested spousal support and child support. Her divorce attorney described the divorce as "hotly contested," and testified that he believed the victim was eligible for a combined total of $14,000 to $20,000 a month in child support and spousal support. On March 14, 2014, the parties appeared in court for a *pendente lite* hearing, which was continued to May. The victim's demeanor in court on March 14 was "happy," and she was observed smiling and laughing.

The following day, the victim, who had trained as a triathlete after separating from appellant, ran a marathon and qualified for the Boston Marathon. She planned to compete in an Iron Man competition in November 2014, and her friends stated that she was excited about her plans and upcoming travel.

On the evening of March 19, 2014, the victim met several members of her triathlon team at a restaurant. She appeared happy and excited that she had qualified for the Boston Marathon. The victim left the restaurant to pick up her children from visitation with appellant.

The minor children had been visiting appellant for dinner that night at his house, which was approximately a thousand yards from the victim's home. Lucy Fuentes, appellant's sister, was also at the dinner, and she left appellant's house at 8:05 p.m. and drove the children to meet the victim at a Harris Teeter grocery store a few miles away.

Security footage from a neighbor's house showed a male jogger arriving at the victim's home and walking up the driveway about ten minutes before the victim arrived with the children. Although the jogger's face is unidentifiable from the video, Nicholas Castillo and David and Stephanie Meeker, friends of the Castillos, identified the jogger as appellant based on the jogger's unusual gait.

The following morning, the children woke up and discovered the victim was missing. In the victim's bedroom, J.C. noted that the bed had been made up "messily" and without the victim's usual care. Several other witnesses also testified that the bed was not made in the manner typical of the victim. J.C. had to pick the locks to enter the victim's bathroom, where he found the shower running with no one in it. J.C. called appellant and told him he could not find the victim.

A little after 7:00 a.m., appellant knocked on the door of the victim's neighbor, Ahmed Qureshi, and told him that the victim was missing. Qureshi noticed that appellant was wearing sunglasses and that it appeared there was "something around" his left eye. Because appellant was prohibited from entering the victim's home, he asked Qureshi to accompany him to the residence. There, Qureshi quickly checked the exterior before entering to find appellant upstairs examining the victim's bedroom. After appellant came downstairs and joined the children in the kitchen, Qureshi asked J.C. if anyone had searched the basement. Appellant responded that they had already searched that area. Qureshi stated that they needed to call 911, but appellant told

him that he needed to get the children to school and left with them. Qureshi returned home, called 911, and reported that the victim was missing.

Law enforcement officers arrived at the residence and searched the basement, where they discovered the victim hanging from a shower head in a bathroom. The victim was wearing a sweatshirt.

Detective Mark McCaffrey with the Loudoun County Sheriff's Office and the lead investigator in the case, called appellant that morning and told him that he needed to speak with him about the victim's disappearance. Appellant stated that he was taking care of his son and would call back. McCaffrey drove to appellant's house and informed him of the victim's death. Appellant expressed no emotion when he learned this information and did not ask any questions about the circumstances of his wife's death. McCaffrey noticed that appellant had a black eye and a fresh scrape under his eye.

The medical examiner, Dr. Constance DiAngelo, testified that the manner in which the victim died was inconsistent with suicide. DiAngelo found multiple bruises and abrasions on the victim's body and stated that such bruises were "very, very unusual" in suicide cases. She also stated that it was very unusual to find a suicide victim's hair underneath the noose, as in this case. DiAngelo opined that the injuries to the victim's neck and face indicated that she died as a result of suffocation and strangulation involving elements of both manual and ligature strangulation. DiAngelo testified that she found two ligature marks on the victim's neck: a deeper, horizontal mark that was consistent with strangulation at the time of death, and a more shallow mark with a different orientation which was consistent with the victim being hung in the shower after death.

The Virginia Department of Forensic Science analyzed bloodstains found on the victim's bed linens and the sweatshirt she was wearing and identified the presence of appellant's DNA.

- 4 -

One of the victim's friends identified the sweatshirt as belonging to the victim. The victim's housekeeper testified that she had not seen appellant in the home following the issuance of the protective order a year earlier.

Two victim recovery dogs were deployed inside the victim's home seventeen days after her death. Morse, commonly referred to as a "cadaver dog," was trained to alert to the odor of human decomposition and large quantities of dried blood; Keela, the second dog, was trained to detect the odor of smaller quantities of dried blood. Morse immediately alerted to the basement bathroom where the victim's body was found and later alerted to a carpeted area at the base of the victim's bed. Keela was "detailed" to the carpeted area where Morse had alerted, but she did not alert. She only alerted to the victim's underwear drawer.

A crime scene investigator with the Loudoun County Sheriff's Office testified that he was unable to obtain fingerprints from the walls of the basement shower despite the fact that ceramic tile similar to the ones in the shower typically made obtaining prints easy. Nicholas Castillo testified that he had visited his mother and used her basement shower the weekend before her death.

On March 21, 2014, the day after the victim's body was discovered, appellant called his orthodontist to report that he had a broken braces bracket and to schedule an appointment to repair it. The orthodontist testified that a bracket will become loose after external pressure or force is applied to either the tooth or the bracket.

J.C., who was eleven at the time of trial, testified that in the year preceding the victim's death, appellant had asked him for the passcode to the victim's home security system. The victim had changed the code after appellant moved out. J.C. gave appellant the code, but then told the victim, who changed it again. When appellant later inquired about the passcode, J.C.

refused to provide it, even after appellant told him that he would give him a gold coin in order to obtain the code. J.C. stated that his refusal to provide the code angered appellant.

Z.C., who was eight at the time of trial, testified that on the night of March 19, 2014, he returned to the victim's home after dinner at appellant's house and slept with the victim for part of the night, but then went to sleep with his brother J.C. He left his blanket in the victim's bed. Z.C. testified that appellant brought him his blanket that night while he was in J.C.'s room.

Eight days after the victim's death, appellant filed a motion to dissolve the divorce. Having survived the victim, appellant became sole owner of the marital estate, the value of which was estimated at between $2.6 and $3.6 million.

On June 20, 2016, the jury found appellant guilty of first-degree murder, burglary, and violation of a protective order.

## II. ANALYSIS

### A. Severance / Protective Order

A grand jury indicted appellant on three charges: murder in the first degree, in violation of Code § 18.2-32; burglary with the intent to commit murder, in violation of Code § 18.2-90; and violation of a protective order, in violation of Code § 16.1-253.2. Prior to trial, appellant filed a motion to sever the violation of a protective order charge. After hearing argument, the court denied the motion to sever, finding that the offenses were based on the same act or transaction and that justice did not require separate trials.

The protective order was entered into evidence at trial. The order reflected that it was in effect at the time of the victim's death. The protective order listed the victim as the petitioner for the order, which was also granted on behalf of the parties' minor children. The order stated that the court had found that the victim had "proven the allegation of family abuse by a preponderance of the evidence" and ordered appellant to "refrain from committing further acts of

family abuse."[1]  The order granted the victim the exclusive possession of the marital residence and ordered appellant to "stay away" from the property.[2]

## Discussion

Appellant argues that the trial court erred by denying his motion to sever the violation of a protective order charge from the murder and burglary charges and in admitting the protective order.[3]

"Whether different offenses should be tried separately is a matter that rests within the sound discretion of a trial court.  Thus, a trial court's ruling on the matter will not be reversed absent a showing that the court abused its discretion."  Cheng v. Commonwealth, 240 Va. 26, 33-34 (1990).

Rule 3A:10(c) allows cases to be joined for trial if justice does not require separate trials and either "the accused and the Commonwealth's attorney consent" or "the offenses meet the requirements of Rule 3A:6(b)."  "Under Rule 3A:6(b), two or more offenses may be joined in a single indictment 'if the offenses are based on the same act or transaction, or on two or more acts or transactions that are [a.] connected or [b.] constitute parts of a common scheme or plan.'"  Scott v. Commonwealth, 274 Va. 636, 644 (2007) (quoting Rule 3A:6(b)).  Therefore, if a

---

[1] Code § 16.1-228 defines "family abuse" as "any act involving violence, force, or threat that results in bodily injury or places one in reasonable apprehension of death, sexual assault, or bodily injury and that is committed by a person against such person's family or household member."

[2] When the Commonwealth asked the court to admit the protective order at trial, counsel for appellant argued that the order itself did not need to be admitted and stated that he was "fine" with the court instructing the jury about the protective order.  Counsel also asked that, if the court was going to admit the court order itself, it redact the judge's signature on the order, because the judge that issued the protective order was the same judge presiding at trial.  The court redacted the signature and entered the order, which was redacted in this manner.  Counsel did not ask the court to redact the order's "family abuse" language.

[3] Appellant did not object to the court trying the murder and burglary cases together.

defendant does not consent to joinder, the Commonwealth must establish that the offenses were either part of the same act or transaction or part of a common scheme or plan and that justice does not require separate trials.

We conclude that the three charged offenses met Rule 3A:6(b)'s requirements for joinder because all three offenses were clearly "based on the same act or transaction." Appellant broke into the victim's house in violation of the protective order with the intent to murder her. He did not leave the residence until he had committed the murder. Each offense took place at the same location and at the same time.

Finding the offenses meet the "same act or transaction" requirement under Rule 3A:6(b), we must now determine whether justice required appellant to have separate trials.

"Justice requires separate trials where the evidence of one of the crimes is not admissible in the trial of the other." Godwin v. Commonwealth, 6 Va. App. 118, 123 (1988).

Generally, "[e]vidence of other independent acts of an accused is inadmissible if relevant only to show a probability that the accused committed the crime for which he is on trial because he is a person of bad or criminal character." Sutphin v. Commonwealth, 1 Va. App. 241, 245 (1985). However, such evidence is admissible when it is "relevant to an issue or element in the present case." Id.[4] Accordingly, evidence of an accused's prior bad acts may be properly admitted

> (1) to prove motive to commit the crime charged; (2) to establish
> guilty knowledge or to negate good faith; (3) to negate the
> possibility of mistake or accident; (4) to show the conduct and

---

[4] In the instant case, while the protective order does not identify any specific act that justified the issuing court's finding that appellant committed family abuse, it permits the inference that appellant engaged in prior misconduct, and thus requires treatment as "prior bad acts" evidence. See Price v. State, 245 S.W.3d 532, 537 (Tex. App.--Houston [1st Dist.] 2007) ("While the protective order does not identify any specific act that justified the issuing court's finding that [defendant] committed family violence, it permits the inference that [defendant] engaged in prior misconduct that is not alleged in either indictment, and thus requires treatment as extraneous offense evidence.").

feeling of the accused toward his victim, or to establish their prior relations; (5) to prove opportunity; (6) to prove identity of the accused as the one who committed the crime where the prior criminal acts are so distinctive as to indicate a *modus operandi*; or (7) to demonstrate a common scheme or plan where the other crime or crimes constitute a part of a general scheme of which the crime charged is a part.

Quinones v. Commonwealth, 35 Va. App. 634, 640 (2001) (quoting Lockhart v. Commonwealth, 18 Va. App. 254, 259, opinion withdrawn and vacated on other grounds on reh'g en banc, 19 Va. App. 436 (1994), aff'd, 251 Va. 184 (1996)); see also Va. R. Evid. 2:404(b).

This list is neither exhaustive nor definitive; intent, general (as opposed to guilty) knowledge, agency, premeditation and other elements of criminal acts are all subsumed within the exceptions to the general rule and may be shown by prior bad act evidence when relevant to prove a material element or issue of the crime charged.

Lafon v. Commonwealth, 17 Va. App. 411, 417 (1993). Further, we note that Virginia law "follows an 'inclusionary approach' to the uncharged misconduct doctrine by admitting such evidence 'if relevant, for any purpose *other than* to show a mere propensity or disposition on the part of the defendant to commit the crime.'" Thomas v. Commonwealth, 44 Va. App. 741, 757 n.8 (quoting Kent Sinclair, Joseph C. Kearfott, Paul F. Sheridan, & Edward J. Imwinkelried, Virginia Evidentiary Foundations § 6.4[A], at 165 (1998)), adopted upon reh'g en banc, 45 Va. App. 811 (2005).

Applying the principles outlined above, we conclude that the protective order itself was admissible in both the first-degree murder trial and burglary trial.

To sustain the charge of first-degree murder, the Commonwealth had to show that appellant committed a "willful, deliberate, and premeditated killing." Code § 18.2-32. The Commonwealth's theory of the case was that appellant willfully killed the victim by entering the marital home in violation of the protective order and then murdering her in her bedroom. Here, the protective order was admissible to prove appellant's opportunity to commit the murder. The

protective order demonstrated that appellant had been barred from entering the marital residence for the prior year. However, appellant's DNA was recovered from bloodstains found on the victim's bed linens and the sweatshirt she was wearing. The protective order shows that it was unlikely he had entered the residence prior to the night of the murder, and thus tended to prove that his DNA found in the bedroom was a result of his presence in the victim's bedroom the night of her death. Because the protective order was relevant to show that there was no reasonable explanation for the presence of appellant's DNA on the victim's clothing and bedding other than his presence in her bedroom on the night of the murder, it served a purpose "*other than* to show a mere propensity or disposition on the part of the defendant to commit the crime." Thomas, 44 Va. App. at 757 n. 8 (quoting Sinclair, supra, at 165).

We further find that the protective order was admissible in the trial for burglary. Code § 18.2-90 provides, in pertinent part, that "[i]f any person in the nighttime enters without breaking or in the daytime breaks and enters . . . a dwelling house . . . with intent to commit murder, rape, robbery or arson . . . he shall be deemed guilty of statutory burglary." The protective order prohibiting appellant from entering the marital residence demonstrated that appellant acted without authority in entering the home. Thus, the protective order was relevant "to establish guilty knowledge or to negate good faith." Quinones, 35 Va. App. at 640 (quoting Lockhart, 18 Va. App. at 259); see also Turner v. Commonwealth, 33 Va. App. 88, 94-95 (2000) (rejecting defendant's argument that he could not be guilty of burglary because he and his wife jointly owned the property he was accused of breaking and entering while he was under court order to have no contact with wife).

We conclude that the protective order would have been admissible in both the murder and burglary trials as it was relevant to an issue or element in each of those cases. However, in order to meet the test for admissibility as other bad acts evidence, the evidence also must be otherwise

admissible. "Admission of evidence of other crimes committed by a defendant . . . is subject to the further requirement that the legitimate probative value of the evidence must exceed the incidental prejudice to the defendant." Rose v. Commonwealth, 270 Va. 3, 11 (2005). "[T]he responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court. The exercise of that discretion will not be disturbed on appeal in the absence of a clear abuse." Ortiz v. Commonwealth, 276 Va. 705, 715 (2008) (quoting Spencer v. Commonwealth, 240 Va. 78, 90 (1990)).

Appellant argues that the protective order would not have been admissible in the murder and burglary trials because the evidence was unduly prejudicial. He contends that even if the parties' marital issues were relevant, the existence of those issues was genuinely uncontested given that the parties were divorcing. Thus, any probative value of the protective order was outweighed by the danger of prejudice to appellant, making the evidence inadmissible. We disagree.

As noted above, the protective order was admissible not merely as evidence of marital issues, but also to prove opportunity and establish guilty knowledge or negate good faith. Although the protective order reflected that appellant had committed a prior act of family abuse, which might have had an adverse effect on him, we cannot say that the trial court abused its discretion in finding that the substantial probative value of the evidence would have outweighed any prejudicial effect.

Because the three charged offenses met the requirement of Rule 3A:6(b) and justice did not require separate trials, the joinder requirements of Rule 3A:10(c) were met. We hold,

therefore, that the trial court did not abuse its discretion in denying appellant's motion for separate trials.[5]

## B. Jury Issues

During *voir dire*, counsel for appellant asked the entire venire a series of questions, including whether anyone knew someone who had either attempted or committed suicide. Prospective Juror Colbert responded that he did. During individual *voir dire* conducted outside the presence of the rest of the venire, Colbert stated that his neighbors had "some history of domestic violence" and that less than two months prior to trial, his female neighbor had hanged herself in a closet. When he learned of his neighbor's death, he immediately thought it murder rather than suicide. Although he had called the police, there "was no investigation done" and it was "swept under the rug." Colbert was "suspicious of that." When asked to explain his statement that there "was no investigation done," Colbert explained that he was out of town when the death occurred, but that when he returned, no one called him or his fiancée to see if they knew anything about the incident. His fiancée had called the police and briefly talked to them, but they did not follow up with her. Colbert had immediately thought it murder rather than suicide when he learned of his neighbor's death. Counsel for appellant asked Colbert if he was

---

[5] Appellant further argues under this assignment of error that the admission of the protective order was error because it was granted under a civil preponderance of the evidence standard, yet was used in a criminal context. Appellant provides no support for this argument and we find it unpersuasive, as we find no reason to examine the protective order in a different manner than we do for all other prior bad acts evidence generally.

Further, in this case, the court that issued the protective order found by clear and convincing evidence that appellant had committed an act of family abuse. While we make no determination on the exact standard of proof that must be applied by a court in determining whether to admit evidence of prior bad acts, we find that any standard would be satisfied by a clear and convincing finding by a circuit court. See Pavlick v. Commonwealth, 27 Va. App. 219, 227-28 (1998) (noting that "[n]o Virginia court has directly addressed the issue of the standard of proof that must be applied by a judge in determining whether to admit evidence of prior bad acts," but finding that if prior bad acts evidence involves a credibility determination, that question is properly reserved for the jury).

"going to be able to separate things and keep this terrible experience or in any way separate it out from any evaluation of the case here?" Colbert replied, "Yeah, I believe so," because his neighbor "had a history of mental illness, and . . . so even though there was some suspicion . . . , I think there was [*sic*] experts that could look at these things and advise on what actually took place, so . . . ."

Colbert also told the court that his fiancée had been a victim of domestic violence in the past. Counsel for appellant asked Colbert whether this fact or his fiancée's feelings about the neighbor's death would put any pressure on him if his fiancée knew he was on the jury, and he responded, "No."

Counsel for appellant moved to strike Colbert in light of his statement that he thought his neighbor's death was murder rather than suicide, and because he was so closely involved with the death that "it would be extremely difficult for him to ultimately remove himself from that." Colbert was recalled for further questioning, and the court asked him if the "entirety of the circumstances" that he had discussed would affect his ability to "judge this case solely on the evidence that is before [him]." Colbert stated that he had come to "a suspicion and a judgment" about his neighbor because he had "witnessed . . . and heard things" himself, where in contrast "[i]n a case where I know nothing, and there is stuff presented from either side, I have no . . . personal involvement, so I would listen to both sides and know that suicide is possible, murder is possible." He further stated, "I think I can listen fairly and make a judgment based on what was presented." The court denied appellant's motion to strike the juror for cause, finding that the further answers given by Colbert clearly demonstrated that "he would be able to deal with this case on the evidence in this case." Colbert served on the jury.

At the end of the sixth day of trial, the court excused the jury for the day. After the jury had left the courtroom and entered the jury room, counsel for appellant told the court that while

the door was open he could hear one of the jurors "crying to the extent of howling." He could "hear it through the door" even after the door was closed. The court stated that court personnel were separating Juror Anderson, the juror who was crying, from the rest of the jury. Counsel for appellant asked the court to question Anderson as to her emotional display, arguing that it would be proper to inquire whether she could follow the court's instructions to hear all the evidence before making a decision in the case. The court declined to adopt appellant's proposed line of questioning, and instead brought Anderson back into court and asked her if she was suffering from any medical condition that would prevent her from serving as a juror. She responded in the negative.

Prior to the commencement of the next day of trial, the court announced that it would further question Juror Anderson. The court also told counsel that a bailiff had informed the court that Anderson had commented that "she was now able to breathe" and that it had seemed to Anderson "that the witness wasn't able to breathe." The witness who had testified immediately prior to the crying reported by appellant's counsel was J.C., appellant's eleven-year-old son. The court questioned Anderson about her statement to the bailiff, and she stated that she "might have held [her] breath there for a minute . . . because of the anguish" and that she thought the witness was not able to breathe because he had started to cry. She "felt very emotional towards that." The court then asked Anderson several additional questions about her feelings and her ability to remain impartial throughout proceedings, in light of "the noise we heard when the [c]ourt was closed." Anderson replied that her ability to remain impartial was "positive" and that her "ability right now does not lean one way or the other." After stating that her ability to remain impartial did not lean toward either side, Anderson made a further unprompted statement about her impartiality to the court, and the court then asked further questions of the juror.

- 14 -

ANDERSON:  I'm still here to observe the witnesses and the evidence in the case, to determine the outcome.  And so nothing that has happened so far or what happened to me --

THE COURT:  Okay.  Can you speak to --

ANDERSON:  -- will deter me.

THE COURT:  I'm sorry, I didn't mean to cut you off.

ANDERSON:  Will deter me.  Will deter my impression.

THE COURT:  Okay.

ANDERSON:  My ability.

THE COURT:  Okay.  Can you speak to us about your ability to set aside any emotions that you may have and keep an open mind --

ANDERSON:  My ability to set aside my emotions are better.  Uh-huh.

THE COURT:  Is what?

ANDERSON:  My abilities to set aside my emotions are better.  I think I have a little bit more control.

THE COURT:  Better than what?  I just want to --

ANDERSON:  Than Friday.

THE COURT:  Okay.

ANDERSON:  I'm more prepared mentally.

THE COURT:  My question has to do with any emotions that you have and how they would affect your ability to fairly and impartially hear the evidence in this case.

ANDERSON:  I am very -- I am very clear minded.  My emotions will not cloud my decision or my -- or my ability to hear the evidence and hear the witnesses.

THE COURT:  Okay.  And are you at this time and throughout the trial able to withhold making any fixed or firm formed opinions about [appellant's] guilt or innocence --

- 15 -

ANDERSON:  Absolutely.

THE COURT:  -- let me finish the question -- until you [have] heard all the evidence in the case?

ANDERSON:  Until I have heard all the evidence in the case, yes.

Following this exchange, counsel for appellant moved to strike Anderson for cause.  The court denied the motion, noting that the juror had stated that she was able to remain impartial.  The court also noted that the juror's behavior had been normal while court was in session.  The court stated that while Anderson had "spoken of anguish and having to hold her breath," it could not "get behind what the cause of that anguish was."

Discussion

Appellant contends the trial court erred by denying him an impartial jury by refusing to strike Jurors Colbert and Anderson for cause.

It is well established that "the right of an accused to trial by 'an impartial jury' is a constitutional right, reinforced by legislative mandate and by the Rules of this court."  Justus v. Commonwealth, 220 Va. 971, 975-76 (1980).  "Code § 8.01-357 assures a defendant a right to an impartial jury drawn from 'a panel [of not less than twenty] free from exceptions.'"  Id. at 975 (quoting Breeden v. Commonwealth, 217 Va. 297, 300 (1976)).  To qualify as a juror, a prospective juror must "stand indifferent in the cause."  Code § 8.01-358.  If a juror "does not stand indifferent to the cause, he is not competent.  If he has any interest in the cause, or is related to either party, or has expressed or formed any opinion, or is sensible of any bias or prejudice, he is excluded by the law."  Taylor v. Commonwealth, 67 Va. App. 448, 454 (2017) (quoting Spangler v. Ashwell, 116 Va. 992, 996-97 (1914)); see Griffin v. Commonwealth, 19 Va. App. 619, 621 (1995) (explaining that "the test of impartiality is whether the venireperson can lay aside the preconceived views and render a verdict based solely on the law and evidence presented at trial").

- 16 -

"Juror impartiality is a question of fact." Huguely v. Commonwealth, 63 Va. App. 92, 121 (2014) (quoting Lovos-Rivas v. Commonwealth, 58 Va. App. 55, 61 (2011)). "Whether a venireman can lay aside a preconceived opinion and render a verdict solely on the evidence is a mixed question of law and fact. Resolution of the question rests within the sound discretion of the trial court." Calhoun v. Commonwealth, 226 Va. 256, 258 (1983). "[T]he trial court must weigh the meaning of the answers given in light of the phrasing of the questions posed, the inflections, tone, and tenor of the dialogue, and the general demeanor of the prospective juror." Smith v. Commonwealth, 219 Va. 455, 464-65 (1978). Further, evidence of a prospective juror's impartiality "should come from him and not be based on his mere assent to persuasive suggestions." Bradbury v. Commonwealth, 40 Va. App. 176, 181 (2003) (quoting McGill v. Commonwealth, 10 Va. App. 237, 242 (1990)).

Although we review the trial court's determination deferentially, "any reasonable doubt as to a juror's qualifications must be resolved in favor of the accused." Breeden, 217 Va. at 298. "In conducting our review, we consider the juror's entire *voir dire*, not merely isolated statements." Lovitt v. Commonwealth, 260 Va. 497, 510 (2000). We will disturb the trial court's decision regarding juror impartiality "only upon a showing of manifest error." Weeks v. Commonwealth, 248 Va. 460, 475 (1994).

### 1. Juror Colbert

Appellant argues that Colbert's *voir dire* revealed his bias. Appellant specifically points to (1) Colbert's statement that he "th[ought] [he] c[ould] listen fairly and make a judgment based on what was presented," and (2) the timing and similarity of his neighbor's death in relation to the allegations presented at trial. He contends that both combined to raise a reasonable doubt as to Colbert's impartiality.

While appellant emphasizes Colbert's use of the word "think," characterizing his response as too equivocal to ensure his impartiality, we note that "the word 'think' can have different meanings depending on one's demeanor, emphasis, and tone of voice—and . . . such contextual determinations must be made by the trial court during *voir dire*." Huguely, 63 Va. App. at 125. Further, in the context of statements made during *voir dire*, "[w]here the record does not indicate inflection and tone, we view the statements in the light most favorable to the Commonwealth." Taylor, 67 Va. App. at 460 n.2. Viewed in the light most favorable to the Commonwealth, we construe Colbert's use of "think" to support a finding that his whole statement to the court—"I think I can listen fairly and make a judgment based on what was presented"—indicated that he was able to listen fairly and judge based upon the evidence. This finding is further supported by the context surrounding Colbert's statement. Colbert made his statement after he was asked whether his past experience with suicide would influence his ability to weigh the evidence in this case. His response was that unlike his prior experience, he had no firsthand knowledge of the facts of this case and "would listen to both sides and know that suicide is possible, murder is possible." These statements, viewed together in context, demonstrate that Colbert's "I think" statement was not too equivocal to ensure his impartiality.

Appellant's additional argument that Colbert was biased because of the recent timing and similarity of his neighbor's death is likewise unsupported by the record. Colbert was specifically asked by counsel for appellant if he would be able to separate his past experience from the current case, and Colbert replied that he believed he would. He also stated that any feelings his fiancée might have about the neighbor's death would not put pressure on him to decide the case in a certain way. Based upon these answers, viewed together with Colbert's other statements that he would listen to both sides, knew that both suicide and murder were possible, could listen fairly, and would make a judgment based on the evidence presented, we cannot say the record as

- 18 -

a whole demonstrates that Colbert was biased in this matter because of his neighbor's death. Thus, we find that the trial court did not abuse its discretion in refusing to strike Colbert for cause.[6]

## 2. Juror Anderson

Appellant also argues that Anderson, in the mid-trial *voir dire*, did not provide unqualified assertions of impartiality. He alleges that Anderson did not unequivocally state that she could set aside her emotions and keep an open mind, and only informed the court that her ability was "better" than it had been the previous day at trial.

However, a full examination of Anderson's mid-trial *voir dire* belies these contentions.[7] Before Anderson stated that her ability to set aside her emotion was "better," the court asked about her ability to remain impartial, and she replied that her "ability right now does not lean one way or the other." She further stated, unprompted by the court, that she was "still here to observe the witnesses and the evidence in the case, to determine the outcome." Following her statement that her ability to set aside her emotions was "better," the court clarified that it was asking her about "any emotions that you have and how they would affect your ability to fairly

---

[6] Appellant also argues that Colbert should have been struck for cause because of his statement that "he would rely upon expert testimony to decide the ultimate issue." However, the record before us reveals that appellant never raised this specific issue before the trial court. "This Court has said '[t]he primary function of Rule 5A:18 is to alert the trial judge to possible error so that the judge may consider the issue intelligently and take any corrective actions necessary to avoid unnecessary appeals, reversals and mistrials.'" Neal v. Commonwealth, 15 Va. App. 416, 422 (1992) (alteration in original) (quoting Martin v. Commonwealth, 13 Va. App. 524, 530 (1992)). Thus, "[n]ot just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." Thomas, 44 Va. App. at 750. Because the requirements of Rule 5A:18 have not been met, we do not consider this argument on appeal.

[7] When a challenge to a juror's impartiality arises mid-trial, we "'will reverse the trial court's decision only for an abuse of discretion,' applying the 'same standard' of review appropriate to appellate consideration of a decision to seat a venireperson." Nelson v. Commonwealth, 41 Va. App. 716, 731 (2003) (quoting Green v. Commonwealth, 26 Va. App. 394, 401 (1998)).

- 19 -

and impartially hear the evidence in this case." Anderson replied that she was "very clear minded" and that her "emotions w[ould] not cloud [her] decision" or "ability to hear the evidence." These statements support the conclusion that Anderson remained impartial despite her emotional response to J.C.'s testimony. Additionally, we note that many of Anderson's statements regarding her emotions and impartiality were fully expressed by her and were not "mere assent to persuasive suggestions." Bradbury, 40 Va. App. at 181 (quoting McGill, 10 Va. App. at 242).[8]

In denying appellant's motion to strike Anderson from the jury panel, the trial court noted Anderson had been able to control her emotions in the courtroom. Further, Anderson unequivocally stated that she could wait to form an opinion until all the evidence was presented. The trial court observed Anderson's demeanor, heard her responses, and determined she was capable of remaining impartial. Nothing in the record demonstrates manifest error in the court's finding that Anderson could impartially continue her service on the jury.[9]

---

[8] Appellant also takes issue with Anderson's statement that nothing would "deter [her] impression," which he argues suggests that she had already come to a conclusion that would not be altered. However, read in its full context, Anderson's statement cannot be viewed as appellant suggests. Anderson's statement that nothing would "deter [her] impression" directly followed her comment that she was "here to observe the witnesses and the evidence in the case, to determine the outcome." Anderson then tells the court that "nothing that has happened so far or what happened to me . . . . Will deter me. Will deter my impression." Thus, in context, Anderson's statement that nothing would "deter [her] impression" was her informing the court that nothing would change her "impression," meaning her ability, to hear the evidence in the case as it was presented. Read properly in its full context, it is clear from Anderson's statement that appellant's argument is without merit.

[9] Appellant also asserts under this assignment of error that the trial court erred because it "harmfully foreclosed any *voir dire* by [appellant], thus limiting the record without fully exploring the issue of partiality." However, the record reveals that appellant has not preserved this argument for our review. Following Anderson's audible crying, counsel for appellant asked the court to inquire whether she could follow the court's instructions to hear all the evidence before she made a decision in the case, but the court instead only asked the juror if she was suffering from any medical condition that would prevent her from serving as a juror. Appellant then filed a motion asking the court to further question Anderson as to whether she could continue to be impartial, set aside her emotions, and fairly consider the evidence and arguments

## C. Attorney-Client Privilege Protection of Notes

On the day the victim's body was discovered, Detective McCaffrey obtained a search warrant for appellant's residence.[10] McCaffrey testified that while he did not actively participate in the search, he "grabbed ahold of . . . [and] got [appellant's] cell phone at one point." McCaffrey then told appellant that he "wanted to get the pass code," and appellant replied he had "a secret clearance" and that his phone was important. McCaffrey told appellant "all right, that's fine" and that it would "take up more time to get it forensically analyzed" or "something along that line." At that point, appellant gave McCaffrey the passcode, stating that he was "being helpful."

At trial, the Commonwealth moved to introduce notes found on the "Notes" application on appellant's iPhone. The Commonwealth's exhibit contained, among other notes,[11] one which listed contact information for attorneys. A second note was entitled "Attorney Client Privilege (Affair)" and detailed the victim's activities and interactions with various individuals. That note also stated that the "document is being prepared for and in conjunction with attorneys . . . ."

---

of both parties. In this motion, appellant "ask[ed] the court to make that limited inquiry and then to rule on whether or not she may continue as a juror." The following day of trial, the court did in fact make this inquiry of Anderson. Following the court's *voir dire* of the juror regarding her emotional state and impartiality, appellant moved to strike the juror based on her responses to the court's questioning. However, at no point did counsel for appellant ask the trial court for the opportunity to ask additional questions of Anderson during the court's mid-trial *voir dire*. Thus, because appellant never argued to the trial court that he should have the opportunity to conduct his own independent *voir dire*, we do not consider this argument on appeal. See Rule 5A:18.

[10] McCaffrey testified that the residence was searched pursuant to a search warrant. The search warrant itself was not made a part of the record.

[11] The other notes included an article about divorce, Bible verses about divorce, and short items entitled "Facebook list," "Ironman shopping list," and "Michelle." Counsel for appellant represented that the "Facebook list" note referenced men that the victim had been "seeing" or "was going to see."

- 21 -

Appellant objected to the admission of the notes, arguing that they were protected by the attorney-client privilege, and moved for a mistrial because "these prosecutors are tainted by this." The court overruled the objection based on attorney-client privilege and denied the motion for a mistrial. The court found that an attorney-client relationship existed, but that appellant had waived privilege when he provided his iPhone's passcode to police.

During appellant's case-in-chief, counsel for appellant asked appellant to explain the notes found on his iPhone. Appellant stated that the note entitled "Attorney Client Privilege (Affair)," which detailed the victim's activities, was made in order to document times at which she was busy and he, rather than the housekeeper or nanny, could have provided child care. Appellant also testified that he kept notes on the victim's possible affairs in preparation for their divorce proceedings. He stated that he obtained the information from the victim's Facebook page and also from his daughter's iPhone.

The Commonwealth did not mention the exhibit containing the iPhone notes in its initial closing argument. In appellant's closing argument, counsel mentioned the notes, arguing that while the Commonwealth was characterizing them as evidence of "stalking," appellant was merely collecting information useful to the divorce proceedings. He also argued that if appellant had been "following" the victim, he would have known that she ran on a secluded trail and that he would have had the opportunity to murder her there. The Commonwealth briefly referenced the notes in its rebuttal closing, arguing that the victim would not have committed suicide because her "old life was going to be over: [t]he fears, the control, the stalking, the snooping into her phone calls, the snooping into her Facebook account, having her followed as [appellant] admitted that he did when she went on vacation."

Appellant argues that that trial court erred by finding that he had waived the attorney-client privilege and in not granting a mistrial based upon the Commonwealth's use of appellant's attorney-client privileged communications which were "seized pursuant to a search warrant."

Virginia law recognizes that "[c]onfidential communications between attorney and client made because of that relationship and concerning the subject matter of the attorney's employment 'are privileged from disclosure, even for the purpose of administering justice.'" Commonwealth v. Edwards, 235 Va. 499, 508-09 (1988) (quoting Grant v. Harris, 116 Va. 642, 648 (1914)). The proponent of the privilege "has the burden to establish that the attorney-client relationship existed, that the communications under consideration are privileged, and that the privilege was not waived." Id. at 509.

Based on the record, we need not decide the more complex question of whether the trial court erred in admitting the notes because any presumed error committed because of their admission is harmless.[12]

"Virginia law requires that in all criminal cases in which the appellate court finds that error occurred in the trial court, it must consider whether the error was harmless." Graves v. Commonwealth, 65 Va. App. 702, 711 (2016); see also Code § 8.01-678. "There are two distinct tests for determining harmless error. One applies when the claim involves constitutional error and the other when it involves non-constitutional error." Graves, 65 Va. App. at 711. In this case, appellant's challenge to the admission of the notes involves a constitutional claim—that the

---

[12] "As an appellate court, we seek 'the best and narrowest ground available' for our decision." Harvey v. Commonwealth, 65 Va. App. 280, 285 n.2 (2015) (quoting Armstead v. Commonwealth, 56 Va. App. 569, 576 (2010)). With respect to this assignment of error, we conclude that our determination that the error, if any, was harmless constitutes the best and narrowest ground.

court's finding of waiver was in error because appellant could not have consented to the search of his iPhone when the iPhone was seized pursuant to a search warrant.[13] We acknowledge that this Court generally analyzes the admission of evidence and whether that evidence was protected by privilege under a non-constitutional harmless error standard. See Castillo v. Loudoun Cty. Dep't of Family Servs., 68 Va. App. 547, 564 (2018). Here, however, because the admission of the notes involves both types of error, we analyze its admission under the more stringent constitutional standard, and find that any error in the admission of the notes was harmless even under this standard.

The standard for constitutional harmless error is well settled. "When a federal constitutional error is involved, a reversal is required unless the reviewing court determines that the error is harmless beyond a reasonable doubt." Pitt v. Commonwealth, 260 Va. 692, 695 (2000); see also Commonwealth v. White, 293 Va. 411, 420 (2017). In order to determine whether the error was harmless beyond a reasonable doubt, we must ask "whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction." Pitt, 260 Va. at 695 (quoting Chapman v. California, 386 U.S. 18, 23 (1967)). Further, in making the determination of whether constitutional error existed, the court must consider, among other factors, "the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted evidence on material points, and the overall strength of the prosecution's case." Lilly v. Commonwealth, 258 Va. 548, 551 (1999).

---

[13] We assume without deciding that appellant properly preserved a constitutional challenge on appeal, but note that appellant never filed a motion to suppress in relation to the iPhone, and the trial court stated that it was not making the finding regarding waiver on a "constitutional level" because that issue was not before it.

Here, we find that the notes had minimal, if any, importance to the Commonwealth's case. Appellant himself testified to the activity set forth in the notes, admitting that he created the note detailing the victim's activities in preparation for their divorce proceedings. Further, it was counsel for appellant who first raised the notes in closing argument, contending that if appellant truly had been stalking the victim, it would not have made sense for him to have killed her at her home rather than in the woods where she often ran alone. The Commonwealth mentioned the notes only in passing during its rebuttal closing, arguing that the victim was not likely to have committed suicide because her "old life"—including appellant's "stalking" and "snooping into her Facebook account"—would soon be over once her divorce was final.

Moreover, overwhelming evidence established appellant's guilt, demonstrating the overall strength of the Commonwealth's case. Three individuals—two friends of appellant and appellant's adult son—identified appellant from security footage as the person who approached the victim's home on the night of her death. Z.C., another of appellant's sons, testified that he had seen his father in the victim's home the night of the killing. Also, appellant's DNA was identified from bloodstains found in the victim's bedroom and on the victim's sweatshirt, after appellant had been barred from the residence pursuant to a protective order for over a year. Further, several points of evidence refuted appellant's theory that the victim committed suicide: the medical examiner testified that the victim was strangled and suffocated and that the manner in which the victim died was inconsistent with suicide; the victim had plans to travel and to engage in athletic activities; and a cadaver dog trained to alert to the odor of human decomposition and dried blood alerted to an area in the victim's bedroom, as well to the bathroom where her body was found. Thus, based upon the record before us, we conclude that any error in admitting the notes found on appellant's iPhone did not create a reasonable possibility that the evidence complained of might have contributed to appellant's conviction.

Consequently, we hold that even if the trial court erred in admitting this evidence, that error was harmless beyond a reasonable doubt.

### D. Introduction of Cadaver Dog Evidence

Appellant filed a pretrial motion to bar evidence of blood and cadaver dog searches and alerts, and the court heard the motion at a pretrial motions hearing.

At this hearing, Rex Stockham, a special agent with the Evidence Response Team within the FBI's Laboratory Division, was recognized as an expert in forensic K-9 operations. Stockham had written a number of papers on human scent evidence that had been peer reviewed and published. He was one of two supervisors of the division's forensic K-9 program. He testified that victim recovery dogs, or "cadaver dogs," were developed to address the FBI's need to locate missing individuals. Stockham stated that cadaver dogs are trained to alert to the odor of decomposing human material and that they can alert to trace amounts and residual odors rather than physical substances.[14] Stockham testified that the odor of human decomposition is "[v]ery" persistent over time.

Stockham testified that he developed a cadaver dog program for the FBI starting in 2005.[15] While developing this program, he met Martin Grime, a National Homicide Search Advisor in the United Kingdom who worked with cadaver dogs. In 2010 or 2011, Grime started to work with the FBI to help develop its program. The program started seeing improved results after Grime's involvement. Since the program's establishment in 2005, Stockham had directed hundreds of crime scenes using cadaver dogs.

---

[14] Stockham acknowledged on cross-examination that scientists do not know what specific chemicals comprise the odor of decomposition to which the dogs alert.

[15] Stockham had previously worked with human scent evidence dogs, typically known as "tracking dogs."

Stockham testified that the FBI had established a scientific working group, consisting of members of the academic community, the canine industry, and various international partners, to develop cadaver dog best practice certification assessment guidelines. He stated that all of the dogs in the FBI program met these guidelines and were required to pass an annual proficiency certification assessment. They were also given routine maintenance training to ensure that they maintained their skills. Stockham testified that some cadaver dogs failed out of the program because they were not proficient.

Stockham explained that the first dog used in this case, Morse, was part of the FBI program and had come to the program already trained. He assessed Morse as "[v]ery proficient" prior to the search of the victim's home. Morse, he noted, did not "make a lot of mistakes." Keela, the second dog used in the search, was a human blood detection dog that was trained to detect the odor of human blood, but not its residual odor. Stockham testified that her proficiency was "exceptional." Stockham had never witnessed a situation involving Morse or Keela in which their handler, Grime, was able to cue them to alert to something that was not there.

Martin Grime also testified at the hearing, stating that he worked as a consultant with the Evidence Response Team. Previously, Grime had worked in British law enforcement for thirty years, including as an instructor at a regional police dog training school. He began cadaver dog detection work in 2000, and soon initiated a victim recovery dog training program for British law enforcement. Grime was qualified as an expert in human remains detection and training victim recovery dogs.

Grime brought Morse and Keela with him when he started his consulting work with the FBI. Both were adult dogs at the time. Grime had trained Morse from a puppy to certification and continued to train him regularly. He explained that Morse was first trained using scent pads which had been applied to corpses. Morse was then trained in "operational" scenarios, including

training using known graves. At the time of the search of the victim's home, Morse was certified by the FBI as a proficient cadaver dog. Grime testified that while proficiency certifications occurred annually, Stockham also conducted occasional "surprise proficiency test[s]." Morse had never failed a proficiency test conducted by the FBI at the time the victim's home was searched.

The Commonwealth introduced into evidence Morse's training records and his 2014 FBI certification. The records reflected that Morse participated in several training exercises from February 2014 through April 2014, all with "excellent" or "[v][ery] good" proficiency ratings. The search in this case was conducted on April 4, 2014. His yearly assessment, conducted on January 23, 2014, reflected that Morse was "very experienced" and "trusted."

Regarding the search of the victim's residence, which occurred on April 4, 2014, Stockham testified that he directed the search with Morse and Keela. Grime was the dogs' handler. Stockham was told that the victim had been found hanging in a bathroom, but that investigators thought that the body previously had been "stashed" somewhere else in the house. The investigators did not tell Stockham where the body had been previously in the house. Stockham only told Grime that they had been asked to assist in a homicide case, and simply instructed him to "come in and run your dog."

When Morse entered the house, he was given a command to search. Without being directed toward the basement, Morse "broke" and went to that part of the home and alerted to the bathroom in the basement. This conduct indicated to Stockham that there was "enough odor [there] that it drew [Morse] in from that distance." While searching the rest of the home, Morse

alerted to the area at the foot of the victim's bed. Stockham testified that Morse would alert where he smelled the highest concentration of odor.[16]

Both Stockham and Grime were questioned about the possibility of odor transference—meaning whether the odor of human decomposition could be transferred from its source to another object by contact, and then further transferred to additional objects by contact. Stockham testified that the odor of human decomposition can be transferred from a cadaver to clothing or to a person handling a body. He acknowledged that he wrote in his incident report from the search that human decomposition odor may be present in or on items associated with daily living, and as such, the dog's positive final responses may or may not have significance. When asked whether it was possible that Morse's alert at the foot of the victim's bed "came from activities of daily living," Stockham stated, "I don't know what the alert was from." He later clarified on re-direct that he did not know what combination of chemicals the dog was relying on to give the alert, but that the dog was trained to find the odor of human decomposition. Grime testified that transference of human decomposition odor, either directly or indirectly, happens "quite easily and readily." He opined that such transference was unlikely in this case because Morse only alerted in two locations; if the transference of odor had been caused by individuals moving through the house, the dog would have responded in more places.

Following the hearing on the matter, the trial court issued an order denying appellant's motion to bar evidence of blood and cadaver dog searches and alerts.[17]

---

[16] Keela only alerted to the victim's underwear drawer. Stockham noted that if there was menstrual blood on the underwear, Keela would alert to that, so he concluded that the alert on the drawer was "inconsequential."

[17] Appellant filed a motion to reconsider the admissibility of the cadaver dog evidence, and the court by order denied the motion to reconsider.

Both Stockham and Grime testified at trial in the same manner as they did at the pretrial motion hearing. In addition, both opined that "to a reasonable degree of scientific certainty," Morse alerted to human decomposition at the foot of the victim's bed.

Discussion

On appeal, appellant alleges that the trial court erred by admitting cadaver dog evidence because the evidence was not based on reliable scientific evidence or methods.[18] Appellant argues that the science underlying cadaver dog evidence is not reliable, and thus the trial court erred in admitting testimony relating to this evidence.

We recognize that the admission of cadaver dog evidence is an issue of first impression in Virginia. However, relying on prior Virginia case law involving dog scent evidence, we conclude that we need not consider whether the science underlying the expert testimony concerning the cadaver dog evidence was reliable. Instead, we need only determine whether a proper foundation was laid for the admission of the evidence.

In Spencer v. Commonwealth, 240 Va. 78, 97 (1990), our Supreme Court held that "[w]hen scientific evidence is offered, the [trial] court must make a threshold finding of fact with respect to the reliability of the scientific method offered, unless it is of a kind so familiar and accepted as to require no foundation to establish the fundamental reliability of the system." Appellant argues that, pursuant to Spencer, the science underlying the expert cadaver dog testimony was not sufficiently reliable to be admissible. This same argument was made and rejected by this Court in the context of dog trailing evidence in Pelletier v. Commonwealth, 42 Va. App. 406 (2004). In Pelletier, defendant argued that the Commonwealth failed to lay a

_____

[18] In addition, appellant argues under this assignment of error that the court applied an incorrect legal standard by placing the burden of proving the reliability of proffered scientific evidence on appellant. However, appellant did not raise this argument before the trial court; thus, we do not address it on appeal. See Rule 5A:18.

proper foundation for the admission of dog trailing evidence because the detective, called as an

expert witness, could not scientifically explain the dog's ability to discern the age of the trail and

the direction in which the suspect traveled. Id. at 417. This Court, rejecting this contention,

explained that a prior dog trailing case from our Supreme Court, Epperly v. Commonwealth, 224

Va. 214 (1982), did not "hold that dog tracking evidence must be explained scientifically before

it can be admitted." Pelletier, 42 Va. App. at 419. We further stated as follows:

> Nevertheless, [defendant] contends that all expert testimony,
> whether it involves a scientific field, such as DNA analysis, or a
> highly specialized one, such as dog trailing or tracking, must be
> preceded by adequate scientific explanation that establishes its
> reliability. The courts of the Commonwealth, however, routinely
> allow expert testimony without a scientific foundation where "'the
> jury . . . is confronted with issues' that 'cannot be determined
> intelligently merely from the deductions made and inferences
> drawn on the basis of ordinary knowledge, common sense, and
> practical experience.'" Schooler [v. Commonwealth], 14 Va. App.
> [418,] 420 [(1992)] (quoting Compton [v. Commonwealth], 219
> Va. [716,] 726 [(1979)]). . . . Likewise, a clear majority of states
> allows dog tracking evidence despite the fact that the dog's ability
> cannot be scientifically explained.
>
>> Many courts have ruled that . . . evidence of
>> tracking a defendant is admissible, subject to
>> establishment of a proper foundation. Even though
>> the precise scientific basis for dog tracking remains
>> uncertain, it is clear that such dogs can be trained to
>> almost unerringly follow a trail left by particular
>> persons even after some time has passed, and even
>> though the trail has crossed the scent left by other
>> persons.
>
> Jay M. Zitter, Annotation, Evidence of Trailing by Dogs in
> Criminal Cases, 81 A.L.R. 5th 563 (2003).
>
> Epperly does not require that a scientific foundation be laid
> for the admission of dog trailing evidence. Rather, it holds that
> dog trailing evidence must be empirically shown to be reliable
> from experience. The showing of reliability is met by testimony
> from the handler establishing that he "was qualified to work with
> the dog and to interpret its responses" and that "the dog was a

> sufficiently trained and proven tracker of human scent." Epperly,
> 224 Va. at 233.

Id. at 419-20.

We conclude that this same analysis applies to the admission of cadaver dog evidence. Cadaver dog evidence does not require a scientific foundation for its admission; rather, the cadaver dog evidence must be shown to be reliable from experience, which can be met through the testimony of the cadaver dog handler. Thus, as with dog trailing evidence in Pelletier, cadaver dog evidence may be admitted without a showing of its precise scientific basis.[19]

Appellant also argues that, due to its lack of scientific reliability, the cadaver dog evidence did not constitute proper expert opinion testimony.

"It is well established that the admissibility of expert testimony is within the sound discretion of the trial court, and that court's decision will not be disturbed absent an abuse of discretion." Schmuhl v. Commonwealth, 69 Va. App. 281, 299 (2018) (quoting Patterson v. Commonwealth, 3 Va. App. 1, 11 (1986)). "The sole purpose of permitting expert testimony is to assist the trier of fact to understand the evidence presented or to determine a fact in issue." Velazquez v. Commonwealth, 263 Va. 95, 103 (2002). In a Virginia criminal proceeding, a qualified expert witness is allowed to testify if "the subject matter is beyond the knowledge and

---

[19] The Michigan Court of Appeals came to a similar conclusion in People v. Lane, 862 N.W.2d 446 (Mich. Ct. App. 2014). In Lane, a case which involved the same cadaver dog, Morse, the Court of Appeals rejected defendant's argument that cadaver dog evidence could not be admitted because chemical evidence could not corroborate whether there was human decomposition at the locations identified by the dog. Id. at 457. In analyzing this argument under MRE 702, Michigan's rule of evidence regarding the admission of expert opinion testimony on areas of specialized knowledge, the Court of Appeals held that a lack of scientific verification of the presence of a specific scent was not reason to exclude cadaver dog evidence in every case. Id. at 457-48. Instead, the Michigan Court of Appeals found that the evidence could be admitted after a sufficient foundation was established that: "(1) the handler was qualified to use the dog, (2) the dog was trained and accurate in identifying human remains, (3) circumstantial evidence corroborates the dog's identification, and (4) the evidence was not so stale or contaminated as to make it beyond the dog's competency to identify it." Id. at 457.

experience of ordinary persons, such that the jury needs expert opinion in order to comprehend the subject matter, form an intelligent opinion, and draw its conclusions." Va. R. Evid. 2:702(a)(ii). "[T]he trial judge must determine whether the subject matter of the testimony is beyond a lay person's common knowledge and whether it will assist the trier of fact in understanding the evidence or in determining a fact in issue." Utz v. Commonwealth, 28 Va. App. 411, 423 (1998). A challenge to an "expert's measurements, methods and determinations . . . does not render inadmissible expert opinion based on those measurements, methods and computations" but goes to the "weight of the evidence," raising "factual questions to be determined by the jury." Hubbard v. Commonwealth, 12 Va. App. 250, 255 (1991).

Provided that certain foundational requirements are met, Virginia courts have allowed the admission of expert testimony regarding dog tracking and narcotics detection dog evidence. As noted above, in Epperly, the Supreme Court examined tracking dog evidence. In permitting the admission of dog tracking evidence, the Court stated as follows:

> We hold that dog-tracking evidence is admissible in a criminal case after a proper foundation has been laid to show that the handler was qualified to work with the dog and to interpret its responses, that the dog was a sufficiently trained and proven tracker of human scent, that the dog was placed on the trail where circumstances indicated that the guilty party had been, and that the trail had not become so stale or contaminated as to be beyond the dog's tracking capabilities.

224 Va. at 233.

In Hetmeyer v. Commonwealth, 19 Va. App. 103 (1994), defendant challenged the admission of testimony relating to a drug dog's reaction to the odor of narcotics. The dog had been presented with a "lineup" of five envelopes and alerted to one which contained cash that had been taken from defendant. Id. at 107-08. This Court, utilizing Epperly in its analysis, found that the trial court did not err in the admission of this evidence:

- 33 -

> Just as the dog's "alert" on Epperly's scent and the related pursuit
> of it to his residence were admissible as substantive evidence in
> that prosecution, we hold that expert testimony with respect to a
> dog's reaction to the odor of narcotics is admissible when
> supported by a proper foundation. Such foundation must establish
> the appropriate training and reliability of the dog in the detection
> of specific drugs by odor and the witness handler's expertise in
> interpreting the dog's behavior, together with circumstances
> conducive to a dependable scent identification by the animal and a
> credible evaluation of its related behavior.

Id. at 109-10.

Epperly and Hetmeyer guide our analysis, establishing that expert testimony regarding cadaver dog evidence is admissible, as long as a proper foundation has been laid. In the context of cadaver dog evidence, we hold that expert testimony relating to a dog's reaction to the odor of human decomposition is admissible after a proper foundation has been laid to show that the handler was qualified to work with the dog and to interpret its responses, that the dog was sufficiently trained in the detection of human decomposition odor, and that the circumstances surrounding the identification were conducive to a dependable scent identification by the animal.

In the instant case, we conclude that these foundational requirements for the admission of the cadaver dog evidence were met.

First, we find that the record contains evidence that Grime was qualified to work with Morse and to interpret his responses. Grime was qualified at trial as an expert in human remains detection and the training of victim recovery dogs. He described his past experience, including his creation of a cadaver dog training program in the United Kingdom. Grime had trained Morse from a puppy to certification and regularly conducted training with him. Stockham had never witnessed a situation involving Morse where Grime was able to cue the dog to alert to something that was not there.

The record also includes evidence that Morse was sufficiently trained in detecting the odor of human decomposition. Grime explained that Morse was first trained using scent pads

which had been applied to corpses, and then trained in "operational" scenarios, including training with known graves. Morse's training records reflect that the dog participated in several training exercises from February 2014 through April 2014, the month of the search of the victim's residence, and that Morse received all "excellent" or "[v][ery] good" proficiency ratings. His yearly assessment reflected that Morse was "very experienced" and "trusted." In addition, Stockham opined that Morse, in the period leading up to the search at issue, was "[v]ery proficient."

Finally, the record includes evidence showing that the circumstances surrounding the identification were conducive to a dependable scent identification by Morse. The search of the victim's residence with Morse was conducted fourteen days after the discovery of the victim's body, and Stockham testified that the odor of human decomposition is "very persistent" over time. Prior to the search, Stockham was told that the victim had been found hanging in a bathroom, but that investigators thought that her body had been previously "stashed" elsewhere in the house. Stockham did not know where the investigators thought the body had been, and he only told Grime that they were assisting with a homicide case before instructing him to "run his dog."

The trial court heard evidence as to the qualifications and training of the cadaver dog handler, the training of the dog itself, and the circumstances surrounding the search and the dog's scent identification. This evidence established a proper foundation for the admission of the cadaver dog evidence. Therefore, we hold that the court did not err in admitting the expert testimony regarding the cadaver dog evidence.[20]

---

[20] Appellant further argues that the admission of the cadaver dog evidence violated Rule 2:703(b) and Rule 2:403. We find no merit in either argument.

Rule 2:703(b) provides that "the opinion of an expert is generally admissible if it is based upon facts personally known or observed by the expert, or based upon facts in evidence." Appellant argues the admission of the cadaver dog evidence violated this evidentiary rule

E. Prosecutorial Misconduct

During closing argument, the Commonwealth's attorney told the jury, "Please remember as you listen to them. You have to hold us to a standard, and that's right. But hold them to a standard, too." Counsel for appellant objected and moved for a mistrial, stating, "Judge, this is three times. It's strike three; they're out. We ask . . . [for] a mistrial. The Commonwealth has gone on this rant about high-priced attorneys and hired-gun attorneys, and whatever she said the first two times I objected. And now she tells this jury that we have a burden." Counsel had previously objected to the Commonwealth's attorney's statements in closing that (1) the "greatest part" of the judicial system was the jury's ability to decide the case according to the law, "no matter how many lawyers you have, no matter how many lawyers you pay to sit and --" and (2) "[n]o matter what you do to try to divert the jury's attention away from the truth, no

<hr>

because Stockham and Grime "did not establish that the dogs were sufficiently reliable for identifying scent from a specific person, or determining that a specific person was ever in an exact location" and "could not identify what the dogs were alerting to." Here, Grime personally conducted the search of the victim's house with Morse and observed him alert in the basement bathroom and master bedroom. He opined that "to a reasonable degree of scientific certainty," Morse alerted to human decomposition. His opinion was derived from his personal observation of Morse the day of the search and from his prior training with Morse. Thus, the evidence did not violate Rule 2:703(b).

Rule 2:403(a) provides that relevant evidence may be excluded if "the probative value of the evidence is substantially outweighed by . . . its likelihood of confusing or misleading the trier of fact." Appellant argues that the cadaver dog evidence improperly permitted the jury to speculate that there was an odor of human decomposition in the bedroom and that its source was the victim, and because there was no foundation for these conclusions, the jury was likely confused or misled. However, as noted above, the Commonwealth had provided a proper foundation for the expert testimony given by Stockham and Grime. They both opined that Morse alerted to the odor of human decomposition, and the jury was free to draw the reasonable inference that this odor derived from the victim.

Appellant further contends that the admission of the cadaver dog evidence invited jury confusion and speculation because it was just as likely, if not more likely, that the dog falsely alerted, alerted due to the presence of menstrual blood, alerted to an odor transferred from the basement, or alerted to a source existing prior to March 19 or to a source created after March 20. However, appellant was given the opportunity to cross-examine, and did cross-examine, both experts on the variables that could produce a cadaver dog's alert. The arguments relating to the likelihood that the dog falsely alerted or alerted to a presence other than the victim's body went only to the weight of the evidence, not its admissibility.

matter what lies you tell when you testify, no matter who comes in here, whether they're high-priced hand-picked --." After appellant's objection to the first statement, the court directed the Commonwealth to "concentrate on the evidence." The court then overruled appellant's objection to the Commonwealth's second statement.

In response to appellant's motion for mistrial, the Commonwealth's attorney said that she was not suggesting that appellant had a burden to carry. Instead, she meant that when he put on evidence, "it's fair for the Commonwealth to suggest that this jury be suspect of this evidence, consider the source of the evidence, consider the price that was paid for the experts. That's all I'm doing." The court denied the motion for mistrial, telling counsel for appellant that

> [w]hen you first objected earlier, the [c]ourt redirected . . . [the Commonwealth's attorney] to discuss the evidence. She has been discussing the evidence. Then the next time you objected, her whole statement hadn't come out. And you said that she was talking about attorneys and she was referring to experts, which is fair argument. I am denying the motion for a mistrial.

The court then instructed the jury that the Commonwealth must prove each element of the charges beyond a reasonable doubt and that there was no burden on appellant to produce any evidence.

Later in closing argument, the Commonwealth's attorney mentioned the alibi notice filed by appellant, noting that, "It . . . gives notice that he 'may' introduce evidence of an alibi. 'May?' Or may not?" Counsel for appellant objected and moved for a mistrial, arguing that the Commonwealth was improperly commenting on the alibi notice when "[i]t's not a requirement that he presents an alibi defense" and that the comment "put a burden onto [appellant], to invoke his right to counsel and his right to interact with his counsel." The court sustained the objection but denied the motion for mistrial, stating that there could be other "legitimate reasons, other than the ones that the Commonwealth would be suggesting, why an alibi defense would not be put on." The court then directed the jury to disregard the Commonwealth's attorney's comment.

- 37 -

<u>Discussion</u>

Appellant argues that the trial court erred in denying his motions for mistrial because the Commonwealth's assertions during closing argument invited mistrial, caused questioning of the verdict's validity, invited speculation, and improperly raised the ire and emotion of the jury.[21]

"The decision whether to grant a mistrial motion is a matter submitted to the circuit court's sound discretion." <u>Lewis v. Commonwealth</u>, 269 Va. 209, 213 (2005).

> The trial court must make an initial factual determination, in the light of all the circumstances of the case, whether the defendant's rights had been so indelibly prejudiced as to require a new trial. Unless we can say as a matter of law that this determination was wrong, it will not be disturbed on appeal. Unless the record shows the contrary, it is to be presumed that the jury followed an explicit cautionary instruction promptly given.

<u>LeVasseur v. Commonwealth</u>, 225 Va. 564, 589 (1983).

Appellant's first mistrial motion was in response to the Commonwealth's attorney's statement, "Please remember as you listen to them. You have to hold us to a standard, and that's right. But hold them to a standard, too." When objecting to this statement, counsel for appellant

---

[21] In addition, appellant challenges the trial court's denial of his motion notwithstanding the verdict in which he argued that several additional statements made by the Commonwealth's attorney during closing argument constituted prosecutorial misconduct. However, while appellant objected to many of these allegedly improper statements, he did not ask for a cautionary instruction on any and moved for a mistrial only twice during closing argument. Thus, the only statements before this Court are the statements challenged by appellant in his motions for mistrial. See <u>Cheng v. Commonwealth</u>, 240 Va. 26, 38 (1990) ("It is well-settled that errors assigned because of a prosecutor's alleged improper comments or conduct during argument will not be considered on appeal unless an accused timely moves for a cautionary instruction or for a mistrial.").

Further, we reject appellant's contention, made in his reply brief, that he preserved his argument regarding the other statements by challenging them in his motion for judgment notwithstanding the verdict. Virginia case law is clear that a party preserves a mistrial argument for appeal as long as the objection's timing and the request for a mistrial do not significantly impair the trial court's ability to take corrective action. See <u>Angel v. Commonwealth</u>, 281 Va. 248, 271-72 (2011). Here, appellant's further arguments in support of a mistrial were made in a post-trial motion after the jury was dismissed. Because appellant failed to raise these issues until after his motion to set aside the verdict, the trial court's ability to take corrective action was significantly impaired.

also referenced his objections to the Commonwealth's remarks about the number of attorneys representing appellant and his "high-priced" experts. We find that none of the three challenged statements warranted a mistrial.

Regarding the burden statement, the Commonwealth asked the jury to hold the defense "to a standard, too." After denying the motion for mistrial, the court instructed the jury that the Commonwealth must prove each element of the charges beyond a reasonable doubt and that there is no burden on appellant to produce any evidence. Even if the Commonwealth's attorney's statement could be construed as an improper comment indicating there was a burden on appellant to produce evidence, the jury was given a prompt cautionary instruction, and there is no indication that this comment was so impressive that it caused prejudice warranting a new trial.

As for the comments on appellant's "high-priced hand-picked" experts, appellant argues that this statement was meant to indicate that his experts only provided the answers they were paid to provide and thus only served to inflame the jury's passions against appellant. However, the trial court found that the statement regarding the experts was "fair argument," and we agree. The Commonwealth's attorney may properly "refer to the evidence and fair inferences from it" during closing argument to a jury. Martinez v. Commonwealth, 10 Va. App. 664, 672 (1990) (quoting Timmons v. Commonwealth, 204 Va. 205, 217 (1963)), aff'd as modified, 241 Va. 557 (1991). "Whether the words used were prejudicial must be judged by a review of the totality of the evidence." Fain v. Commonwealth, 7 Va. App. 626, 629 (1989). On cross-examination, the Commonwealth's attorney had elicited testimony from appellant's experts on how much they had been paid for their involvement in the case. This line of questioning was proper because the Commonwealth was entitled to attempt to persuade the jury that bias existed on the part of the experts. "The bias of a witness, like prejudice and relationship, is not a collateral matter. The

bias of a witness is always a relevant subject of inquiry when confined to ascertaining previous relationship, feeling and conduct of the witness." Henson v. Commonwealth, 165 Va. 821, 825-26 (1936); see also Henning v. Thomas, 235 Va. 181, 187 (1988) (finding error in a medical negligence case when the trial court refused defendants' counsel's request to cross-examine plaintiff's expert witness about how he became involved in the case and allowed only the question of whether the witness was being paid to give his testimony). Therefore, the fact that the experts that testified in appellant's defense were paid was a fact in evidence and constituted a proper subject for closing argument.

Appellant also challenges the Commonwealth's attorney's comment that the "greatest part" of the judicial system was the jury's ability to decide the case according to the law, "no matter how many lawyers you have, no matter how many lawyers you pay to sit . . . ," arguing that this statement was meant to denigrate his counsel and inflame the jury's passions against him. Here, we find that the Commonwealth's singular reference to the fact that appellant had a number of attorneys representing him, while not a proper subject for closing argument as it did not refer to the evidence or fair inferences to be drawn from the evidence, was not so prejudicial as to likely inflame the passions of the jury. In addition, the trial court noted that the Commonwealth's attorney refrained from discussing appellant's counsel after being so directed by the court. Under such circumstances, we cannot say that the Commonwealth's isolated reference to appellant's team of attorneys during closing argument "so indelibly prejudiced" him that it necessitated a mistrial. LeVasseur, 225 Va. at 589. Thus, we find that the trial court did not err in denying appellant's first motion for mistrial based upon the Commonwealth's statements regarding a burden, appellant's experts, and appellant's attorneys.

We also find that the court did not err in denying appellant's second mistrial motion which challenged the Commonwealth's attorney's statement regarding his alibi notice.

Appellant challenged the Commonwealth's statement to the jury that appellant's alibi notice "gives notice that he 'may' introduce evidence of an alibi. 'May?' Or may not?" The court sustained appellant's objection to the statement but denied his motion for mistrial, and then directed the jury to disregard the challenged statement. Although the Commonwealth's statement was an attempt to indicate that appellant was unsure if he was going to introduce an alibi defense because he did not have one, the court promptly instructed the jury to disregard the Commonwealth's statement. We find that any implication from the Commonwealth's statement regarding the alibi notice was not so prejudicial that it could not be cured by the cautionary instruction.[22]

Because we find that the challenged statements in both mistrial motions did not create indelible prejudice against appellant as to require a new trial, we conclude that the trial court did not abuse its discretion in denying both motions for mistrial.

### F. Testimony via Two-Way Closed-Circuit Television

Prior to trial, the Commonwealth filed a motion for the use of two-way closed-circuit television for the testimony of Z.C., pursuant to Code § 18.2-67.9. At a hearing on the motion, Mary Spooner, a licensed clinical social worker, was qualified as an expert in the field of trauma specialization. She testified that she had been treating Z.C. since April 2014, the month after the victim's death. Her therapy with Z.C. was focused on helping him resolve the grief and loss surrounding the traumatic nature of his mother's death. It was reported to Spooner that Z.C. had displayed aggressive behaviors and experienced bed wetting episodes before and after visitation with appellant. She testified that Z.C. found it difficult to communicate about the events

---

[22] We acknowledge that in this case, appellant's notice of alibi was admitted into evidence. Despite being in evidence, the Commonwealth's statement regarding the alibi notice was not a proper subject for closing argument because it suggested that appellant had a burden to produce evidence on his behalf.

surrounding the victim's death, and opined that this difficulty was because Z.C. was sensitive and it was hard for him to tolerate uncomfortable feelings. She further opined that Z.C. would suffer "severe emotional trauma" from testifying in open court. Spooner based this opinion on her

> experience with him about tolerating his difficult emotions. He is a very sensitive little boy. He will be sensitive to the emotions of everyone. Court is a difficult place to be testifying for adults let alone a little boy who is incredibly sensitive and he doesn't tolerate emotional discomfort well and he's been through a lot already. He still misses his mother a lot.

She also stated that in her opinion, the likelihood that Z.C. would experience severe emotional trauma would be lessened if he were allowed to testify via closed-circuit television.

On cross-examination, Spooner was asked if the court limiting the courtroom to only the attorneys, jurors, and appellant would "help" Z.C. in testifying. She replied that "it would be hard for [Z.C.] to testify in front of a parent because he's very sensitive." Counsel for appellant then asked Spooner, "if [Z.C.] was told that he had to come in and testify and that his dad was going to be on the other side of the courtroom and he was going to be asked questions and to listen carefully and to answer the questions, he could do that, couldn't he?" Spooner replied, "I don't know that he could." On rebuttal, the Commonwealth's attorney asked Spooner what was the basis of her opinion that "there is a substantial likelihood that testifying in open court especially in front of [appellant], his father, would cause [Z.C.] severe emotional trauma?" Spooner replied that she had met with Z.C. on a regular basis for two years and "gotten to know him[,] which is my job to understand children and their treatment process[,] and based on my experience with [Z.C.] it is my opinion that having to testify in open court would be significantly and severely traumatizing to him emotionally."

After hearing argument, the court granted the Commonwealth's motion.

Discussion

Appellant contends that the trial court erred in allowing Z.C. to testify via two-way closed-circuit television. He argues that Code § 18.2–67.9 is unconstitutional and that the trial court erred in applying the requirements of Maryland v. Craig, 497 U.S. 836 (1990).

### 1. The Constitutionality of Code § 18.2-67.9

"In assessing the constitutionality of a statute, we must presume that the legislative action is valid. The burden is on the challenger to prove the alleged constitutional defect." Woolfolk v. Commonwealth, 18 Va. App. 840, 848 (1994) (quoting Perkins v. Commonwealth, 12 Va. App. 7, 14 (1991)). "Every act of the legislature is presumed to be constitutional, and the Constitution is to be given a liberal construction so as to sustain the enactment in question, if practicable." Moses v. Commonwealth, 27 Va. App. 293, 298 (1998) (quoting Bosang v. Iron Belt Bldg. & Loan Ass'n, 96 Va. 119, 123 (1898)). "When the trial court rules on the constitutionality of a statute, we review such decisions *de novo*." Johnson v. Commonwealth, 56 Va. App. 244, 248 (2010).

Appellant first argues that Code § 18.2-67.9 is unconstitutional because the United States Supreme Court decision allowing the use of closed-circuit television, Maryland v. Craig, 497 U.S. 836 (1990), was overruled by Crawford v. Washington, 541 U.S. 36 (2004). Our Court rejected this same argument in Roadcap v. Commonwealth, 50 Va. App. 732 (2007). In Roadcap, we stated as follows:

> [Appellant] nonetheless suggests we "make new law" (his expression) by reexamining the underlying logic of Craig in light of newer, but distinguishable, decisions like Crawford . . . which he claims recognizes a more robust application of confrontation clause rights. We decline the invitation. As nearly all courts and commentators have agreed, Crawford did not overrule Craig. Whether it could have or should have, we do not say, and it is not our place to predict whether any of Crawford's progeny will do so. "When a precedent of the Supreme Court has direct application in a case, we are not at liberty to ignore that precedent in favor of

other Supreme Court decisions employing a similar analysis in a different factual and legal context." Johnson v. Commonwealth, 267 Va. 53, 76 (2004) (citation omitted). Lower courts must "follow the case which directly controls," leaving to the Supreme Court the sole "prerogative of overruling its own decisions." Id. (citation omitted); see also United States v. Hatter, 532 U.S. 557, 567 (2001); State Oil Co. v. Khan, 522 U.S. 3, 20 (1997) (stating "it is this Court's prerogative alone to overrule one of its precedents"). The holding as well as the *ratio decidendi* of Craig, therefore, stands as binding authority.

Id. at 742-43 (footnote omitted).

This panel is bound by the holding in Roadcap. See Startin v.Commonwealth, 56 Va. App. 26, 39 n.3 (2010) (*en banc*) (noting that a holding by one panel of this Court "bind[s] all other three-judge panels under the interpanel accord doctrine"). Thus, appellant's argument that Code § 18.2-67.9 is unconstitutional due to the holding of Crawford fails.

Appellant further argues that Code § 18.2-67.9 is unconstitutional because the statute is broader in scope than the statute examined in Craig and therefore its application in this case violated his confrontation right under the Sixth Amendment.

In Craig, the Supreme Court upheld a Maryland statute permitting child abuse victims to testify from outside the courtroom through the use of one-way closed-circuit television. 497 U.S. at 841. The Supreme Court declared that, while "'the Confrontation Clause reflects a *preference* for face-to-face confrontation,'" defendants do not have an "*absolute* right to a face-to-face meeting with witnesses against them at trial." Id. at 844, 849 (quoting Ohio v. Roberts, 448 U.S. 56, 63 (1980)). However, the Court cautioned that while not absolute, "the face-to-face confrontation requirement" may not "easily be dispensed with." Id. at 850. The Court held that "a defendant's right to confront accusatory witnesses may be satisfied absent a physical, face-to-face confrontation at trial only where" (1) the "denial of such confrontation is necessary to further an important public policy," and (2) "the reliability of the testimony is otherwise assured." Id.

We acknowledge that the statute at issue, Code § 18.2-67.9, is broader in scope than the Maryland statute found constitutional in Craig. The Maryland statute permitted the use of closed-circuit television for a child victim's testimony in a child abuse case. Id. at 840 n.1. In contrast, Code § 18.2-67.9 permits the use of closed-circuit television for an "alleged victim or a child witness" in criminal proceedings "involving an alleged offense against a child, relating to a violation of the laws pertaining to kidnapping . . . , criminal sexual assault . . . , or family offenses pursuant to Article 4 . . . of Chapter 8 of Title 18.2, or involving an alleged murder of a person of any age." Noting the differences between the statutes, appellant argues that Craig only allowed for closed-circuit television testimony for victims of child abuse and that the state had a unique and compelling interest in protecting children under those specific circumstances. Thus, Craig's reasoning may not be extended to protect other interests.

We are unpersuaded by this argument. While the Virginia statute is broader than the specific statute addressed in Craig, we do not find that the language of Craig itself limits its holding to child abuse cases. At no point in Craig did the Supreme Court indicate that it was establishing a definite limitation as to when the Confrontation Clause permits testimony by closed-circuit television. Rather, we view Craig as allowing a necessity-based exception for face-to-face, in-courtroom confrontation where the witness' inability to testify in court invokes a state's interest in protecting the witness, and do not regard its specific language as limiting this reasoning only to the protection of a state's interest in protecting child abuse victims. See Horn v. Quarterman, 508 F.3d 306, 319-20 (5th Cir. 2007) ("Craig's references to 'an important public policy' and 'an important state interest,' are reasonably read to suggest a general rule not limited to protecting child victims of sexual offenses from the trauma of testifying in a defendant's presence." (citation omitted) (quoting Craig, 497 U.S. at 850, 852)).

Here, the General Assembly has indicated by its enactment of Code § 18.2-67.9 its public policy interest in reducing trauma for child witnesses involved not only in child abuse, but in a range of serious crimes. This statute represents the legislature's judgment as to the circumstances that best accommodate both the public's interest in protecting child witnesses and a defendant's right to confront adverse witnesses. Although this statute is broader in scope than the statute examined in Craig, nothing in the language of Craig itself indicates that Code § 18.2-67.9 is unconstitutional because of its broader provisions. Therefore, we reject appellant's challenge to the constitutionality of Code § 18.2-67.9.

## 2. The Specific Requirements of Craig

Appellant also argues that the trial court erred in allowing the use of two-way closed-circuit television because the requirements for the use of closed-circuit television mandated by Craig were not present in this case.

In Craig, the Supreme Court held that a trial court's finding that an alternate method of taking testimony must be case-specific, based upon specific factual findings that: (1) the alternate method "is necessary to protect the welfare of the particular child witness who seeks to testify"; (2) the "child witness would be traumatized, not by the courtroom generally, but by the presence of the defendant"; and (3) "the emotional distress suffered by the child witness in the presence of the defendant is more than *de minimis, i.e.*, more than 'mere nervousness or excitement or some reluctance to testify.'" 497 U.S. at 855-56 (quoting Wildermuth v. State, 530 A.2d 275, 289 (Md. 1987)).

In the instant case, appellant alleges that the trial court erred by not making the specific findings that Z.C. would be "traumatized, not by the courtroom generally, but by the presence of the defendant" and that his emotional distress would be more than "mere nervousness or excitement or reluctance to testify."

However, it is clear from the record that the trial court did in fact make these specific findings, as is mandated under Code § 18.2-67.9. See Code § 18.2-67.9 (testimony may be taken by closed-circuit television if the court "finds that the child is unavailable to testify in open court in the presence of the defendant, the jury, the judge, and the public for any of the following reasons," including that "the child will suffer severe emotional trauma from so testifying"). In granting the Commonwealth's motion at the pretrial hearing, the court explained that it did so because Spooner's testimony demonstrated that there was a "substantial likelihood" that Z.C. would "suffer severe emotional trauma from testifying in open court due to the presence of [appellant]." In addition, the court found that the potential "severe emotional trauma is clearly more than *de minimis*," and "more than on the level of nervousness or excitement."

Moreover, we find no error in the court's determinations. "When reviewing the decisions of a trial court, we give great weight to the court's factual findings, which will not be disturbed on appeal unless plainly wrong or without evidence to support them." Parrish v. Commonwealth, 38 Va. App. 607, 613 (2002). In addition, "we consider all the evidence, and any reasonable inferences fairly deducible therefrom, in the light most favorable to the party that prevailed at trial, which is the Commonwealth in this case." Toliver v. Commonwealth, 38 Va. App. 27, 31 (2002) (quoting Byers v. Commonwealth, 37 Va. App. 174, 179 (2001)).

In this case, evidence adduced at trial supported the finding that Z.C. would be traumatized, not by the courtroom generally, but by the courtroom presence of appellant. A month after the victim's death, Spooner began treating Z.C., helping him to resolve grief he experienced due to the traumatic nature of his mother's death. Spooner was informed that Z.C. had displayed aggressive behaviors and experienced bed wetting episodes before and after visitation with appellant. She was asked if limiting the courtroom to only the attorneys, jurors, and appellant would "help" Z.C. in testifying, and she replied that "it would be hard for him to

testify in front of a parent because he's very sensitive." Clearly, the only parent Spooner could have been referencing regarding Z.C.'s inability to testify was appellant. Further, when asked whether Z.C., if he "was told that he had to come in and testify and that [appellant] was going to be on the other side of the courtroom and he was going to be asked questions and [had] to listen carefully and to answer the questions, . . . [he] could do that," Spooner replied, "I don't know that he could." Z.C.'s behavior surrounding his visitations with appellant and Spooner's testimony about Z.C.'s ability to testify in front of appellant provided sufficient support for the trial court's finding that the child would be traumatized, not by the courtroom generally, but by the presence of appellant.

Spooner's testimony also established that the trial court did not err in its finding that Z.C's emotional distress would rise to more than mere nervousness or excitement or some reluctance to testify. She opined that there was a substantial likelihood that Z.C. would suffer severe emotional trauma from testifying in open court. Spooner based her opinion on Z.C.'s "incredibly sensitive" nature and his inability to tolerate his "difficult emotions." She also pointed to the emotional discomfort he had already experienced due to the victim's death and the difficulty he had in discussing the events surrounding her death. This testimony provided a sufficient basis for the trial court to determine that Z.C.'s emotional distress was more than mere nervousness or reluctance to testify, and thus we cannot say that this finding was plainly wrong or without evidence.

Here, the trial court found Z.C. would be traumatized, not by the courtroom generally, but by the presence of the defendant and that his emotional distress would be more than mere nervousness or excitement or reluctance to testify. The record supports these findings; therefore, we reject appellant's argument that the trial court erred in its application of Craig in the instant case.

G. Testimony Regarding Appellant's Silence

Prior to trial, appellant filed a motion to bar the Commonwealth from eliciting testimony from Detective McCaffrey that appellant had no response when McCaffrey informed him of the victim's death. Appellant argued that any evidence of his lack of response to McCaffrey's questioning violated his Fifth Amendment right under the United States Constitution and Article I, § 8 of the Virginia Constitution. Appellant also alleged that the evidence was inadmissible because it was ambiguous and would result in improper speculation by the jury.

The court denied the motion to bar the Commonwealth's introduction of testimony that appellant displayed no emotion when he was told his wife had died.

At trial, Detective McCaffrey testified that he arrived at the victim's residence at about 9:55 a.m. the morning of the victim's death. He stated that one of his duties as lead detective was to provide death notices to the victim's family. Someone provided McCaffrey with appellant's phone number, and he called appellant and informed him that he wanted to speak with him about the victim's "disappearance." Appellant stated that he had his youngest son with him and that he would arrange for someone to care for the child before speaking with the detective. McCaffrey told appellant that he wanted to speak with him immediately because it was important, and appellant replied that he would "get back to" McCaffrey and hung up. At that point, McCaffrey went to appellant's home and gave him a "death notification" regarding the victim. McCaffrey testified that appellant displayed no emotion in response to this information. McCaffrey also testified that appellant did not ask questions as to how the victim had died.

Discussion

Appellant argues that the trial court erred by permitting testimony regarding appellant's silence and lack of emotion when McCaffrey informed him of the victim's death. Appellant

- 49 -

contends that this testimony had no probative value and only invited jury speculation and that admitting evidence of appellant's lack of response violated his Fifth Amendment right to remain silent.

In the instant case, we need not decide whether the trial court erred in admitting the testimony regarding appellant's response to being informed of the victim's death because we conclude that any potential error was harmless.[23]

Appellant challenges the admission of McCaffrey's testimony on the evidentiary basis that it had no probative value and on the constitutional basis that it violated his Fifth Amendment right to silence. Because appellant's challenge to the admission of the testimony involves both constitutional and non-constitutional harmless error, we analyze its admission under the more stringent constitutional standard, finding that any error in the testimony's admission was harmless even under this standard.

"When a federal constitutional error is involved, a reversal is required unless the reviewing court determines that the error is harmless beyond a reasonable doubt." Pitt, 260 Va. at 695. In order to determine whether the error was harmless beyond a reasonable doubt, we must ask "whether there is a reasonable possibility that the evidence complained of *might* have contributed to the conviction." Id. (quoting Chapman, 386 U.S. at 23). Further, in making the determination of whether constitutional error existed, the court must consider, among other factors, "the importance of the tainted evidence in the prosecution's case, whether that evidence was cumulative, the presence or absence of evidence corroborating or contradicting the tainted

---

[23] We do not address the issues of whether evidence of appellant's pre-custodial silence was too speculative to be admitted or violated his Fifth Amendment rights because "[a]s an appellate court, we seek 'the best and narrowest ground available' for our decision." Harvey, 65 Va. App. at 285 n.2 (quoting Armstead, 56 Va. App. at 576). With respect to this assignment of error, we conclude that our determination that the error, if any, was harmless constitutes the best and narrowest ground.

evidence on material points, and the overall strength of the prosecution's case." <u>Lilly</u>, 258 Va. at 551.

Examining these factors in the present case, we first emphasize the relative lack of importance of McCaffrey's testimony to the Commonwealth's case. Here, McCaffrey testified that, after providing appellant with the information that the victim had died, appellant displayed no emotion in response and did not any ask questions as to how the victim had died. Any inference the jury could have drawn from these facts would have been inherently ambiguous. Based on McCaffrey's testimony, the jury reasonably could have inferred that appellant's reaction indicated he was not surprised to hear that the victim was dead, and further inferred that this was because he had in fact murdered her. However, the jury just as reasonably could have inferred that appellant's reaction was motivated by other factors. Some individuals might display no emotion when they experience extreme shock or surprise.[24] McCaffrey did not testify as to how other individuals to whom he gave death notifications in the past had reacted, and therefore the jury did not have a rational basis for concluding whether appellant's reaction was typical or atypical. Thus, because any inference the jury might have drawn from McCaffrey's testimony would have been inherently ambiguous, the evidence had little probative value.[25]

Further, as discussed *supra* in Part II.C, the record contains substantial evidence supporting appellant's conviction. Two of appellant's friends and his adult son identified appellant from security footage as the person who approached the victim's home on the night of her death. Z.C., another of appellant's sons, testified that he had seen appellant in the victim's

---

[24] This assertion is supported by appellant's own testimony. In testifying on his behalf, appellant stated that when he received the information that the victim had died, he was "shocked," "floored," and "paralyzed."

[25] In addition, McCaffrey's testimony was not mentioned by the Commonwealth in its closing argument, in which it emphasized certain aspects of the evidence to the jury in its effort to obtain a conviction.

home the night of the killing. Additionally, appellant's DNA was identified from bloodstains found in the victim's bedroom and on the victim's sweatshirt after appellant had been barred from the residence pursuant to a protective order for over a year. Further, the medical examiner opined that the victim was strangled and suffocated and that her death was inconsistent with suicide.

In light of the testimony's lack of importance and the overall strength of the Commonwealth's case, we conclude that any error potentially resulting from the admission of the testimony regarding appellant's reaction after being notified of the victim's death was harmless beyond a reasonable doubt.[26]

### H. Cross-Examination of Z.C. and Limitation of Questioning of McCaffrey

Z.C. testified at trial. On direct examination, he testified that he left his blanket in the victim's bed the night she was killed. He testified that appellant brought him his blanket that night while he was in his brother J.C.'s room. He testified that he knew it was appellant because he could see his face.

On cross-examination, counsel for appellant asked Z.C. if he sometimes threw things at people, and he replied no.[27] Counsel then asked Z.C. if the Commonwealth's attorney had "talked to you a lot about whether or not you threw something at [appellant] two years ago?," and Z.C. replied yes. Z.C. stated that he did not know how many times he had talked about the matter with the Commonwealth's attorney, but that it was more than once. Counsel then asked

---

[26] While we acknowledge that the evidence of appellant's reaction was not cumulative or corroborated by other evidence, we find that these factors are not dispositive to the question of whether its admission constituted constitutional error in the present case because of the overwhelming evidence of appellant's guilt and the lack of probative value of the testimony itself.

[27] This line of questioning was related to appellant's assertion that Z.C. threw a flashlight at him the afternoon prior to the victim's death and that was why he had a black eye the morning after her death.

whether the Commonwealth's attorney had "practiced talking to you about whether or not you threw a flashlight or threw something towards your dad," and Z.C. said no. Counsel asked Z.C. when he had last "practiced going over this" with the Commonwealth's attorney, and Z.C. stated it had been "a couple [of] weeks ago." He stated that he did not know if he had previously talked to the Commonwealth's attorney about his testimony. Counsel asked Z.C. if the Commonwealth's attorney had talked about Z.C.'s blanket when they "practiced being here," and at that point the Commonwealth objected, arguing that the question would confuse Z.C and mislead the jury because it suggested that Z.C. had rehearsed his testimony with her. The court sustained the objection as to the use of the word "practice," but allowed counsel to ask the question. Counsel asked Z.C. further questions about his previous conversations with the Commonwealth's attorney.

Prior to trial, the Commonwealth filed a motion to exclude testimony regarding Detective McCaffrey's employment history with the Loudoun County Sheriff's Office. The Commonwealth moved the court to order appellant to refrain from referencing at trial the fact that McCaffrey was not re-sworn by the sheriff following the sheriff's re-election and that his last day of employment with the office was December 31, 2015, prior to the trial's commencement. During a hearing on the motion, the Commonwealth's attorney stated that she had reviewed the files and spoken with the sheriff and was told that there were no past performance issues with McCaffrey. The Commonwealth's attorney also noted that she had requested McCaffrey's personnel evaluations and any internal investigation files and that all of these records reflected that McCaffrey had received high performance assessments. She represented that the sheriff had no issues with respect to McCaffrey's truthfulness, veracity, or integrity. The Commonwealth's attorney informed the court that McCaffrey was not re-sworn

by the sheriff due to McCaffrey's support for another candidate during the primary campaign for sheriff.

The court granted the Commonwealth's motion, finding that the fact that McCaffrey was not re-sworn was not relevant or probative to an issue at trial.

Discussion

Appellant argues that the trial court erred by denying him effective cross-examination when it did not allow him to question Z.C. about practicing his testimony and did not allow questioning about Detective McCaffrey's employment history.[28]

"[L]imitation of cross-examination is within the trial court's discretion." Jackson v. Commonwealth, 266 Va. 423, 438 (2003). When a trial court limits a defendant's cross-examination, the accused must proffer the excluded testimony for the record on appeal. Stewart v. Commonwealth, 10 Va. App. 563, 568 (1990). "The purpose for the proffer 'is to assure that the record will be complete.'" Evans v. Commonwealth, 39 Va. App. 229, 236 (2002) (quoting Lowery v. Commonwealth, 9 Va. App. 304, 308 (1990)).

Appellant argues that the trial court improperly limited his cross-examination when he was prevented from questioning Z.C. about practicing or rehearsing his testimony with the Commonwealth. However, contrary to appellant's argument, the record makes clear that he was able to properly cross-examine Z.C. about his prior interactions with the Commonwealth's attorney. Here, the trial court did not limit cross-examination on whether Z.C. had prepared for

---

[28] Appellant also argues that the trial court erred in limiting cross-examination of J.C. As with Z.C., appellant contends that he was not allowed to examine the issue of J.C. practicing his testimony with the Commonwealth's attorney. J.C. also testified at trial. On cross-examination, counsel for appellant asked J.C. if he had discussed the timeline of the afternoon prior to his mother's death with the Commonwealth's attorney. However, counsel did not ask J.C. any questions about "practicing" or preparing his testimony with the Commonwealth's attorney. Because counsel did not pursue this line of questioning with J.C., this issue is not before us on appeal.

trial with the Commonwealth's attorney, but rather only prohibited the use of the word "practice" during questioning. Appellant was allowed to ask and did ask Z.C. several questions about what he discussed with the Commonwealth's attorney in preparation for trial. We find no error in the court's limited restriction on appellant's cross-examination. Further, even if counsel was prevented from eliciting information by not being able to use the word "practice" during cross-examination, counsel did not proffer what this testimony would have been. Therefore, on appeal, we cannot examine any alleged error because appellant did not proffer what Z.C.'s expected testimony would have been in response to questions involving the word "practice."

Appellant also argues that the court erred in denying him the opportunity to question McCaffrey regarding his work history and performance records. Appellant sought to cross-examine McCaffrey on his employment performance history based on the fact that he had not been re-sworn by the sheriff.

"Evidence is admissible if it is both relevant and material." Patterson v. Commonwealth, 62 Va. App. 488, 493 (2013) (quoting Evans-Smith v. Commonwealth, 5 Va. App. 188, 196 (1987)). "'Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case' [and] . . . 'material if it relates to a matter properly at issue' in the case." Cousins v. Commonwealth, 56 Va. App. 257, 271 (2010) (first quoting Ragland v. Commonwealth, 16 Va. App. 913, 918 (1993); then quoting Evans-Smith, 5 Va. App. at 196).

At the time the court granted the Commonwealth's motion prohibiting any questioning regarding McCaffrey's work history, there was no evidence before it that his employment history, or the fact that he was not re-sworn, was relevant to a material issue at trial. Thus, the

court did not abuse its discretion by denying appellant the opportunity to cross-examine McCaffrey about his employment history.[29]

## I. Brady Claim

Appellant raises a Brady claim regarding Detective McCaffrey's actions in an unrelated case. The facts relating to this claim are as follows. In June 2015, Alejandra Rueda, one of the two Commonwealth's attorneys prosecuting appellant, was assigned to prosecute a DUI offense against James Napier.[30] On June 21, 2015, three days prior to Napier's DUI arrest, Napier's friend, A.H., had died at his home. Detective McCaffrey was assigned to investigate A.H.'s death. He consulted with Rueda regarding this investigation approximately one week after A.H.'s death to determine if any charges should be filed against Napier. Rueda instructed McCaffrey that there were no charges to file at that time because the cause of A.H.'s death was still unknown. She instructed McCaffrey to wait until the results of A.H.'s autopsy were known and to then inform her of the results. In October 2015, McCaffrey received the results of the autopsy report showing that A.H. had died of GHB poisoning.[31] McCaffrey wrote in an

---

[29] After trial, appellant learned that there was an issue regarding McCaffrey's truthfulness in relation to an investigatory report. We address appellant's argument regarding this issue in his next assignment of error. However, appellant argues under this assignment of error that the trial court erred in not allowing questioning on McCaffrey's employment history because "[h]ad [appellant] been able to show that McCaffery had a history of making false reports that contributed to his not being re[-]sworn as a deputy, the jury would have been able to consider this in the evaluation of his credibility." This argument is without merit because, as we explain *infra*, the evidence relating to the investigatory report was not proper impeachment evidence and was therefore inadmissible.

[30] At this time, Rueda was also prosecuting appellant for the offenses currently on appeal. Appellant was indicted for these offenses in May 2014, and his trial for these charges took place during May and June 2016.

[31] Gamma Hydroxybutyrate, commonly known as "GHB," is a central nervous system depressant. The drug "has not approved use in the U.S., where it is sometimes abused as an illicit drug or used in date rape." Taber's Cyclopedic Medical Dictionary 988 (23d ed. 2017).

investigatory report dated October 23, 2015 that he had consulted with Rueda and that "she advised that there was no applicable criminal charge to be filed" against Napier.

In late October 2015, Napier's attorney for his DUI charge informed Rueda that Napier would be pleading guilty to the offense. Rueda prepared a guilty plea memorandum that stated that the Commonwealth agreed to not prosecute Napier for further offenses regarding the events described in the police report related to the DUI offense.

In January 2016, McCaffrey left the Loudoun County Sheriff's Office and A.H.'s death investigation was reassigned to Detective Wayne Promisel. Promisel met with Rueda on January 12, 2016 and showed Rueda a copy of the autopsy report. After additional investigation by Promisel, Rueda suggested that he obtain a warrant charging Napier with distribution of GHB.[32]

After Promisel obtained the arrest warrant on February 11, 2016, he provided Rueda with all of the investigatory reports in the Napier case. In a written stipulation filed with the trial court in Napier's distribution case,[33] Rueda stated that this was the time at which she first saw that McCaffrey had written that he had consulted with her and that she had declined prosecution.[34] Rueda also represented that she had never met with McCaffrey about the death investigation after the initial meeting that occurred one week after A.H.'s death and that McCaffrey did not provide her with a copy of the autopsy report nor discuss the cause of A.H.'s

---

[32] The distribution of GHB charge was suggested to Rueda by Promisel; Rueda was unaware of the relevant code section until Promisel suggested it during their January 12 meeting.

[33] Napier had filed a motion to dismiss his distribution of GHB charge, arguing that because A.H.'s death was mentioned in the police report concerning his DUI offense, any prosecution related to her death should be barred pursuant to the terms of the DUI plea agreement.

[34] Rueda's admission makes it clear that she was aware of her disagreement with McCaffrey's statement in his investigatory report in February 2016, prior to trial in appellant's case.

death with her. She stipulated that her testimony regarding the matter would be that McCaffrey's report was "incorrect in its statement that he met with [her] and she declined prosecution."

On November 7, 2016, following his trial for the offenses on appeal, appellant filed a supplemental motion to set aside the verdict and to dismiss due to government misconduct,[35] alleging that the Commonwealth had violated Brady v. Maryland, 373 U.S. 83 (1963), by withholding the evidence that Detective McCaffrey had falsified a police report in A.H.'s death investigation.

Following the filing of this motion, on December 1, 2016, Nicole Wittmann, the other Commonwealth's attorney prosecuting appellant, wrote a letter to appellant's counsel that was filed with the trial court. The letter stated that she had met with McCaffrey and that he had advised her that in addition to the initial meeting following A.H.'s death, he had met Rueda "in passing in the hallway or as a pop-in in her office" after he had received the autopsy report. McCaffrey stated that the meeting had been very brief and that he did not show Rueda the autopsy report, and merely informed her that the victim had died of an overdose. Wittmann wrote that although Rueda did not recall this meeting, she did "not doubt [McCaffrey's] recollection or veracity."

On December 6, 2016, the court held a hearing on appellant's motion. Wittmann stated that the Commonwealth did not take, and had never taken, the position that McCaffrey or Rueda had "in any way asserted anything that was a lie or a falsehood to the [c]ourt." Wittmann stated that the letter detailed McCaffrey's own recollection of the incident, which Rueda never asserted was false.

---

[35] Appellant had filed an initial motion for judgment notwithstanding the verdict and in the alternative for a new trial based on several different grounds on September 29, 2016.

The trial court denied appellant's motion to set aside the verdict and dismiss due to government misconduct. The court, assuming without deciding that the first two prongs of Brady were met, found that appellant had not demonstrated prejudice.

Discussion

Appellant argues that the trial court erred by not granting the motion to set aside the verdict based upon the Commonwealth's Brady violation.

"A Brady violation occurs when the government fails to disclose evidence materially favorable to the accused." Youngblood v. West Virginia, 547 U.S. 867, 869 (2006). "Brady obligations extend not only to exculpatory evidence, but also to impeachment evidence[.]" Coley v. Commonwealth, 55 Va. App. 624, 630 (2010).

To establish a Brady violation, a defendant must establish that:

> a) The evidence not disclosed to the accused must be favorable to the accused, either because it is exculpatory, or because it may be used for impeachment; b) the evidence not disclosed must have been withheld by the Commonwealth either willfully or inadvertently; and c) the accused must have been prejudiced.

Hicks v. Dir., Dep't of Corr., 289 Va. 288, 299 (2015) (quoting Workman v. Commonwealth, 272 Va. 633, 644-45 (2006)). "The first two Brady components require the evidence to be favorable to the defendant and to have been suppressed by the prosecution. The third Brady component is that the defendant must prove prejudice." Mercer v. Commonwealth, 66 Va. App. 139, 146 (2016).

"In making a Brady challenge, [a] defendant cannot simply allege the presence of favorable material and win reversal of his conviction. Rather, [he] must *prove* the favorable character of evidence he claims has been improperly suppressed. Speculative allegations are not adequate." Coley, 55 Va. App. at 630 (alterations in original) (quoting Currie v. Commonwealth, 30 Va. App. 58, 67 (1999)). "We review the trial court's findings of historical

fact only for 'clear error,' but we review *de novo* the trial court's application of defined legal standards to the particular facts of a case [. . .] ." Doss v. Commonwealth, 59 Va. App. 435, 455 (2012) (alteration in original) (quoting Blue v. Commonwealth, 49 Va. App. 704, 710 (2007)).

In this case, appellant argues that a Brady violation occurred because the evidence of McCaffrey's false police report was favorable to appellant in that it could be used for impeachment, it was withheld by the Commonwealth, and this caused prejudice because appellant could not use it to impeach the lead detective who was heavily involved in the case.

Contrary to appellant's argument, we find that the facts fail to establish that a Brady violation occurred because appellant did not establish that the evidence at issue was favorable to him, a finding requisite for this Court to conclude that the Commonwealth violated its obligations under Brady.[36]

As noted above, for evidence to be considered favorable to the accused, it must be either exculpatory or able to be used for impeachment. See Hicks, 289 Va. at 299. Appellant argues that the evidence that McCaffrey had made a false statement on a police report would have damaged McCaffrey's credibility in his trial and thus could have been used as impeachment evidence under Rule 2:607(a)(viii).[37] Rule 2:607(a)(viii) allows impeachment to be proved by "any other evidence which is probative on the issue of credibility because of a logical tendency to convince the trier of fact that the witness's perception, memory, or narration is defective or impaired, or that the sincerity or veracity of the witness is questionable." Appellant relies on the

---

[36] As we determine that appellant failed to satisfy the first prong of Brady, we need not discuss Brady's other two requirements, that the evidence not disclosed was withheld by the Commonwealth either willfully or inadvertently and that the accused suffered prejudice.

[37] While we use the term "false report" in our analysis, we note that the trial court "assumed but [did] not decide[]" that "[t]he nature of the evidence . . . was false, misleading, or otherwise of impeachment value." Because it is not necessary for the resolution of this issue, we express no opinion on whether the facts actually established that McCaffrey had made a false statement in the investigatory report in light of his and Rueda's recollections of the matter.

part of the rule that allows impeachment evidence showing "that the sincerity or veracity of the witness is questionable." In other words, appellant alleges that McCaffrey's false statement on a police report was proper impeachment evidence because it demonstrated that his veracity was questionable due to the false statement.

However, in this case, appellant is attempting to attack McCaffrey's credibility based upon one specific act of conduct. Thus, we find the admission of this evidence is properly analyzed under Rule 2:608, the evidentiary rule regarding impeachment which discusses specific instances of conduct.[38] Rule 2:607(a)(i) does allow for impeachment through "introduction of evidence of the witness's bad general reputation for the traits of truth and veracity," but only "as provided in Rule 2:608(a) and (b)." Rule 2:608(b) explicitly limits the application of Rule 2:607(a)(i) by providing that "specific instances of the conduct of a witness" may neither be "used to attack or support credibility" nor "proved by extrinsic evidence." In this case, evidence that McCaffrey had once made a false statement in a police report in an unrelated matter was evidence of a specific act which addressed a collateral issue. The alleged false statement in the police report was inadmissible to prove McCaffrey's general untruthfulness because even if his statement that he had consulted with Rueda was untrue, it was only a specific act of untruthfulness regarding an extrinsic matter. See Massey v. Commonwealth, 67 Va. App. 108,

---

[38] Although it is true, as noted by appellant, that Rule 2:607(a)(viii) allows impeachment to be proved by evidence "that the sincerity or veracity of the witness is questionable," we find nothing in this language that changes or limits the long-standing principle in Virginia prohibiting impeachment of a witness' character by showing specific acts of untruthfulness. See Lambert v. Commonwealth, 9 Va. App. 67, 71 (1989); Clark v. Commonwealth, 202 Va. 787 (1961); Bradley v. Commonwealth, 196 Va. 1126 (1955). Further, we also find it appropriate to seek guidance in Rule 2:608 as opposed to Rule 2:607(a)(viii) because Rule 2:608 is the more specific rule involving impeachment evidence and specific instances of conduct, where Rule 2:607(a)(viii) concerns the admission of impeachment evidence generally. See Commonwealth v. Brown, 259 Va. 697, 706 (2000) ("[W]hen one statute speaks to a subject generally and another deals with an element of that subject specifically, the statutes will be harmonized, if possible, and if they conflict, the more specific statute prevails.").

127 (2016) (concluding that defendant failed to establish that the Commonwealth violated its obligations under Brady because the statements alleged to be Brady material were collateral and thus could not be used for impeachment).

Appellant failed to satisfy the first prong of Brady because he did not establish that the evidence would have been favorable to him. Therefore, no Brady violation occurred by virtue of the Commonwealth's failure to disclose McCaffrey's alleged false statement on the report prior to trial. Accordingly, we find that the trial court did not err in denying appellant's motion to set aside the verdict and to dismiss due to government misconduct.

## J. *In Camera* Review of Notes

On April 18, 2016, about a month prior to trial, one of the Commonwealth's attorneys prosecuting appellant's case emailed his counsel to inform him that the Commonwealth's attorneys had met with three of the Castillo children, J.C., Z.C., and V.C., for the first time that day. The email stated that "[t]here are some statements we feel we need to turn over": first, that "[J.C.] indicated that [Z.C.] came in[]to his bedroom at 11pm. Then clarified it may have been between 9-11pm;" and second, that "[J.C.] stated that on the evening of March 19th, [appellant] said he had somewhere he needed to go. His Aunt Lucy took them to Harris Teeter and his father got into a different vehicle. He did not see him drive away, just get into another vehicle." These statements were inconsistent with statements J.C. had previously made. Counsel for appellant asked the Commonwealth's attorney to forward any notes from this meeting, and she replied that neither she nor any law enforcement officer had taken notes and that the meeting had not been recorded. The Commonwealth's attorney stated that she had "turned over that which the rules and law requires."

After this exchange, but prior to trial, the Commonwealth's attorney informed counsel for appellant that Dr. Judy Hanley, director of the Children's Advocacy Center, where the interviews

had taken place, had taken notes during the meeting. Counsel for appellant subsequently contacted Dr. Hanley, who informed counsel that she had taken notes but had given them to the Commonwealth and did not keep a copy.

On April 28, 2016, during a scheduling hearing, counsel for appellant informed the court about the meeting and noted that after interviewing the children, the Commonwealth had turned over new statements made by J.C. that contradicted earlier statements the child had made. Counsel stated that Z.C. had also been making inconsistent statements to other interviewers, "[s]o there has got to be discrepancies there as far as [Z.C.] is concerned." Counsel also stated that V.C.'s account had been consistent and that he did not know if the child had said something different in the meeting, but that he was "sure that the Commonwealth would have given us that discrepancy statement if that's the case."

Counsel for appellant asked the court to compel the Commonwealth to turn over the notes, or, in the alternative, to review the notes *in camera*, arguing that the notes could contain <u>Brady</u> material and that it was important for the defense to have the "context" surrounding the statements. The Commonwealth's attorney responded that the meeting was for witness preparation, not for investigation, and that the notes were attorney-work product. She stated that she had provided appellant's counsel with the inconsistent statements, which was all the information she was required to turn over. The court ordered the Commonwealth to review the notes in its possession and "comply with <u>Brady</u> consistent with everything you've been put on notice to do today," but did not order that the notes be provided to appellant's counsel. The court also declined to review the notes *in camera*.

At trial, after the conclusion of the Commonwealth's direct examination of J.C., counsel for appellant informed the court that he had not been aware of some new statements J.C. had made during his testimony. He noted that this was the reason he was seeking the notes from

Dr. Hanley and again asked the court to compel the Commonwealth to turn the notes over to counsel. The Commonwealth responded that J.C.'s statements were a result of new questions and were not inconsistent with his prior statements.

The court denied appellant's motion. Counsel for appellant asked the court to make Dr. Hanley's notes a part of the record. The court took appellant's motion under advisement.

Following trial, the court granted appellant's motion to make Dr. Hanley's notes regarding J.C. a part of the record. Appellant filed a further motion to also include in the record Dr. Hanley's notes regarding Z.C. and V.C. The court granted the motion as to Z.C. but denied it as to V.C.[39]

Discussion

Appellant argues that the trial court erred by not reviewing Dr. Hanley's notes *in camera* to determine whether they contained exculpatory evidence.[40]

"Where the Commonwealth and the defendant dispute the exculpatory nature of . . . evidentiary materials, the trial court may conduct an *in camera* review of the material to resolve the dispute." Currie, 30 Va. App. at 68. "The trial court's determination of the question whether it should undertake the review of the disputed material is a discretionary matter. Whether that discretion was properly exercised will depend on the specific factors of each case." Bowman v. Commonwealth, 248 Va. 130, 135 (1994). Among such factors are "the reasons given by the

---

[39] The court's reasoning for denying the motion related to V.C. was that appellant had made motions for the production of Hanley's notes of the interviews of "the children," but had not specifically requested production of the notes of V.C.'s interview.

[40] Appellant also argues that the court erred in not ordering Hanley's notes pertaining to V.C. to be made a part of the record. However, the notes from V.C.'s interview are included in the sealed document containing the notes from J.C.'s and Z.C.'s interviews. Assuming *arguendo* that the court erred in not ordering the notes pertaining to V.C. to be made a part of the record, those notes have in fact been included in the record, and thus there remains no error to be addressed by this Court.

defense in justifying access to the disputed material, the time of the request, or the amount of material involved." Id. at 135-36. Mere possibility or speculation that the evidence sought "might contain 'potentially exculpatory evidence' imposes neither a duty of disclosure upon the Commonwealth, nor a duty of inspection *in camera* by the court." Ramdass v. Commonwealth, 246 Va. 413, 420 (1993) (citation omitted), vacated and remanded on other grounds, 512 U.S. 1217, original judgment adhered to on remand, 248 Va. 518, 521 (1994).

Appellant contends that the inconsistent statements summarized by the Commonwealth's disclosure provided a legitimate basis for his belief that Dr. Hanley's notes contained additional exculpatory evidence under Brady. We disagree and find that the trial court properly exercised its discretion in declining to review Dr. Hanley's notes *in camera*.

Here, appellant presented the trial court with no evidence beyond mere speculation that the notes contained any additional inconsistent statements made by either J.C. or Z.C.[41] The speculative nature of appellant's argument is especially evident in light of the fact that the Commonwealth promptly complied with its Brady obligations by providing counsel with the inconsistent statements made by J.C. during the child's interview. Appellant's argument that the notes might have contained additional inconsistencies simply because the Commonwealth disclosed other specific inconsistencies does not rise to a level above mere speculation, therefore we find that the court had no duty to review the notes *in camera*.[42] See United States v. Savage,

---

[41] Further, having reviewed Dr. Hanley's notes included in the record on appeal, it is evident that these notes do not include any potentially exculpatory information regarding the testimony of J.C. and Z.C. The notes themselves are Dr. Hanley's account of the children's conversations with the Commonwealth's attorneys. The notes do not reveal any further inconsistent statements made by J.C. or Z.C. and include nothing else that could be considered potentially exculpatory.

[42] Appellant also argues that the trial court abused its discretion by not reviewing the notes *in camera* because the notes themselves were less than ten pages in length, and therefore the review by the court would not have been burdensome. As stated in Bowman, one of the factors to consider in determining whether a court properly exercised its discretion in deciding

885 F.3d 212, 222 (4th Cir. 2018) (concluding that *in camera* review was not required where the defendant's only assertion was that further inconsistent statements "might exist" in a prosecutor's personal notes from the prosecution's meetings with a witness who had made prior inconsistent statements).

## III.  CONCLUSION

For the foregoing reasons, we affirm appellant's convictions.

<u>Affirmed.</u>

---

whether to review disputed material is "the amount of material involved."  248 Va. at 136. However, this is simply one factor to consider and is not dispositive of the question of whether a court has abused its discretion in declining to review disputed material *in camera*.  While the notes at issue here are short in length, appellant could not provide any basis beyond mere speculation for the court to review the material, and its length alone cannot transform the material into evidence requiring review by the court.