# COURT OF APPEALS OF VIRGINIA

**Record No. 1043-25-3**

JOSIE HOWARD LANTRY

v.

COMMONWEALTH OF VIRGINIA

Present: Judges Malveaux, Athey and Frucci

Argued at Lexington, Virginia

Opinion Issued May 12, 2026[*]

## FROM THE CIRCUIT COURT OF MONTGOMERY COUNTY
Robert M.D. Turk, Judge

Wade M. McNichols for appellant.

Melanie D. Edge, Assistant Attorney General (Jason S. Miyares,[1] Attorney General, on brief), for appellee.

## MEMORANDUM OPINION BY
## JUDGE CLIFFORD L. ATHEY, JR.

Following a jury trial that began on May 5, 2025, in the Circuit Court of Montgomery County ("trial court"), Josie Howard Lantry ("Lantry") was convicted of statutory burglary, petit larceny, and interfering with the property rights of another. On appeal, Lantry assigns error to the trial court for admitting in evidence a video and photograph showing a pellet rifle and a pellet pistol, which were in his possession when he was arrested. Assuming without deciding that the admission of the video and photograph in evidence was error, we hold that the error was harmless. Therefore, we affirm.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

[1] Jay C. Jones succeeded Jason S. Miyares as Attorney General on January 17, 2026.

# I. BACKGROUND[2]

In 2023, Justin Van Dyke ("Van Dyke") maintained a "primary residence" in Christiansburg, Virginia. On December 19, 2023, Van Dyke was visiting with his parents in Alabama when later that evening, he received notification from his home security system of a potential intruder in his primary residence in Christiansburg. The security system's "smart sensor [had] detected light and motion in an upstairs attic area in the back of the house." Van Dyke then logged into his security-camera system, which further showed "a vehicle parked in the driveway," "lights on inside the house," and "someone" that Van Dyke did not know "on one of the cameras walking back and forth." As a result, Van Dyke contacted law enforcement in Virginia, who subsequently apprehended Lantry in Van Dyke's driveway. The police determined that Lantry had stolen several personal items from inside Van Dyke's residence. The police also found in Lantry's possession a pellet rifle and a pellet pistol that operated using compressed $CO_2$.

A grand jury subsequently indicted Lantry on one count of burglary with a deadly weapon, one count of petit larceny, and one count of interfering with the property rights of another. The Commonwealth later successfully moved to amend one of the charges from burglary with a deadly weapon to a single count of statutory burglary.

Pretrial, Lantry moved *in limine* to bar the Commonwealth from introducing "testimony and audiovisual recordings showing [him] in possession of a compressed carbon dioxide or air pellet pistol and pellet rifle." In support, Lantry contended that he was "not indicted for any crime related to the pellet guns," and therefore the evidence "[wa]s of no relevance or probative value for the charges for which [he] [wa]s indicted." The trial court heard argument on the motion *in limine* just

---

[2] "We consider the evidence and all reasonable inferences fairly deducible therefrom in the light most favorable to the Commonwealth, the prevailing party at trial." *Logan v. Commonwealth*, 299 Va. 741, 745 (2021) (quoting *Crawford v. Commonwealth*, 281 Va. 84, 97 (2011)).

prior to jury selection on the morning of the scheduled trial. During argument, Lantry reasserted that "the introduction of . . . what appear[s] to be weapons but are actually compressed air pellet guns[] would be unduly prejudicial to [him] and they're not relevant and their exclusion won't do anything to materially harm the Commonwealth's case in chief." The Commonwealth responded that it "believe[d] [such evidence] goes to his intent that . . . while entering the house during that four-day period, . . . he intended to continue to occupy it as he would go in and out over that four-day period." The Commonwealth also agreed to "stipulate to the [rifle and pistol] being compressed air and being pellet guns."

The trial court took Lantry's motion *in limine* under advisement, whereupon voir dire was conducted, a petit jury was empaneled, and the parties presented their opening statements. The Commonwealth then called Van Dyke, who testified that he and his family had last visited their Virginia home around Thanksgiving of 2023. He added that after concluding the Thanksgiving holiday, he left for Alabama after securing his Virginia residence by locking all the doors and windows. He further testified that he had also previously placed "a few security cameras outside of the house" for extra security. Van Dyke then recounted viewing the security footage from the security cameras and alerting law enforcement to the presence of the intruder in his Virginia home.

Over Lantry's objection, the Commonwealth sought to introduce the video recording from one of the security cameras, which coincided with the approximate time when the officers arrived at the Virginia residence and subsequently arrested Lantry. Outside of the presence of the jury, the Commonwealth proffered to the trial court that the video depicted Lantry with "one of those . . . pellet guns with him when [officers] [came] to arrest him" and that "it goes to the overall intent . . . to occupy this house and make it his own." The trial court ruled that the Commonwealth could "show the video" but could not "say that it shows his intent to stay because . . . you've nolle prossed the breaking [in] with a deadly weapon." Lantry then proposed as an alternative ruling that the

- 3 -

Commonwealth only be permitted to show portions of the video that did not show any of the pellet guns. However, the trial court rejected Lantry's counterproposal by explaining, "I'm not going to let [the Commonwealth] argue that it shows [Lantry] intend[ed] to stay by using some air pistol. No. Whatever the video shows, it shows. Your client can't hide from that." The trial court continued, "[I]t's like a photograph, you know, your client doesn't get to pick and choose what he likes and what he doesn't like. The evidence is the evidence, the video is the video, whatever it shows, shows." The trial court then clarified that Lantry was permitted to "ask the [witness] if you want just to prove it's an air gun if that's what you think you need to do," reiterating that the trial court was "not going to let [the Commonwealth] take that evidence and try to develop an argument that it's some kind of deadly weapon."

Based on the foregoing discussion, the trial court overruled Lantry's motion *in limine* and admitted the video security footage in evidence. The Commonwealth then published the footage to the jury, which showed Lantry walking near his car that was parked in Van Dyke's driveway. As a result, Lantry was shown with his pellet rifle for about ten seconds in the footage before he set the pellet rifle down off-camera. The footage concluded with the police officers arriving to arrest Lantry.

The Commonwealth then called Officer Timothy Lusk ("Officer Lusk") of the Christiansburg Police Department, who had been wearing his body-worn camera at the time he arrested Lantry. The body-worn camera footage, which was admitted in evidence without objection, showed Lantry describing how he had traveled across the country from California to Christiansburg. Lantry told Officer Lusk that he had lived in Van Dyke's home for four days because he "was under the impression that this was a free country" and thought the house was "uninhabited." Lantry also indicated that he was sleeping in a sleeping bag in one of the rooms. He

then admitted to trying to pawn a watch from Van Dyke's home because he "figured if the house was uninhabited, then . . . [its contents] should be able to be acquired."

Officer Lusk also testified that he took a photograph of several personal items Lantry had on him at the time of his arrest. That photo depicted a watch,[3] Lantry's pellet rifle and pistol, pellets for each pellet gun, and a magazine that held the rifle pellets. The Commonwealth then sought to introduce the photo in evidence over Lantry's objection. The trial court overruled Lantry's objection, stating, "I've already made my decision . . . on it. I mean it is what it is." The Commonwealth did not ask Officer Lusk any questions about the pellet guns.[4]

Officer Lusk then testified about his subsequent inspection of Van Dyke's home. Officer Lusk indicated that an outside "door had been forced in and damaged," then "somebody used a piece of scrap wood and screwed it back in to secure that door closed from the inside," rendering the door inoperable. Officer Lusk also testified that he observed "the [door's] lock mechanism . . . shifted into a different position from where it had been for a period of time," which he further testified was "indicative that there was a blow to that lock, or a force was applied to that lock." He also testified that on another "exterior door," "a lock had been changed out with a new lock so . . . somebody had access to the property." Photographs of the damaged doors and interior of the home were also admitted in evidence without objection. Officer Lusk further testified to finding a sleeping bag in one of the bedrooms, which contained a wallet with Lantry's North Dakota ID inside.

The Commonwealth then called Thomas Asbury ("Asbury"), whose wife was coworkers and friends with Van Dyke. Asbury testified about 14 additional photographs his wife took of Van

---

[3] Van Dyke later clarified that none of the items in this photograph were his, including the watch.

[4] On cross-examination, Officer Lusk clarified to the jury that the pellet guns depicted in the photograph of Lantry's personal effects were powered by "$CO_2$" and "were functional air rifles."

Dyke's home after law enforcement arrived at the scene.[5] These photos depicted "stuff," including clothes, "str[e]wn about" in the master bedroom and closet and several tools placed throughout the home. The photographs also illustrated the wood plate that was screwed over the garage door's frame and a doorknob on the kitchen door that Asbury explained "was a different color and newer," meaning "it wasn't weathered" and "it was . . . a new installation." These photos further depicted a box on the kitchen counter containing hardware "look[ing] to be old hardware from the lock that was there" and "a receipt there from Lowe's . . . beside the box with the hardware contents." These additional photos were also admitted in evidence without objection.

The Commonwealth then recalled Van Dyke, who explained that the wood panel was not screwed into the doorframe when he left after Thanksgiving, nor was the condition of the master bedroom as it was reflected in the photographs. He also testified that he did not leave tools laying around the house and that "the kitchen counter was clean before we left." In addition, he testified that he took his own set of photographs when he returned to the home from Alabama, which he then described to the jury. He testified that the photographs depicted "a jar on the front steps . . . that had cigarette butts and things like that inside it" and "a cigar or something like that" on the ground on his front porch. Van Dyke clarified that he did not smoke and the jar was not there when he left. He also took photos of "some paperwork" he found in the garage that "wasn't ours." The papers included information about North Dakota's Real ID and an information sheet for *pro se* litigants appearing before the United States District Court in the District of North Dakota. Van Dyke's photographs were also admitted in evidence without objection.

Van Dyke then testified that several items were missing from his home, including a Louis Vuitton coin purse, approximately $1,800 in cash, and a drill. He further testified that he took photos of an empty envelope where the cash was stored and a Louis Vuitton box that previously

_____

[5] Asbury's wife was "on a work trip out of the country" during the trial.

contained the coin purse. Those photos were also admitted in evidence. Finally, he explained to the jury that he never gave Lantry permission to take any of those items or to enter his property.

The Commonwealth rested its case-in-chief, and Lantry did not present any evidence in his defense. Following the trial court instructing the jury as to the law applicable to the facts of the case, both parties presented their closing arguments. During its closing argument, the Commonwealth did not mention Lantry's pellet guns. However, counsel for Lantry did state during closing argument that the Commonwealth "seized a lot of items from [Lantry] including a couple of BB guns and a watch and pellets for the air guns" but none of the items Van Dyke asserted were missing from the home. The jury then retired to deliberate and returned with its verdict, finding Lantry guilty on all three charges. The trial court subsequently sentenced Lantry to ten years' incarceration, with all but time served suspended. Lantry appealed.

II. ANALYSIS

A. *Standard of Review*

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Jones v. Commonwealth*, 38 Va. App. 231, 236 (2002).

> An abuse of discretion can occur in three principal ways: "when a relevant factor that should have been given significant weight is not considered; when an irrelevant or improper factor is considered and given significant weight; and when all proper factors, and no improper ones, are considered, but the court, in weighing those factors, commits a clear error of judgment."

*Graves v. Shoemaker*, 299 Va. 357, 361 (2020) (quoting *Landrum v. Chippenham & Johnston-Willis Hosps., Inc.*, 282 Va. 346, 352 (2011)). "Only when reasonable jurists could not differ can we say an abuse of discretion has occurred." *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

B. *Any error in admitting evidence of Lantry possessing pellet guns was harmless.*

Lantry contends that the trial court erred by admitting "evidence that [he] possessed two airguns during the offense." In support, he first contends that the admitted evidence was not relevant and, in the alternative, that even if the evidence was relevant, it was unduly prejudicial. Assuming without deciding that the admission of the evidence was in error,[6] we hold that the error was harmless.

Evidence is relevant when it has "any tendency to make the existence of any fact in issue more probable or less probable." Va. R. Evid. 2:401; *see Utz v. Commonwealth*, 28 Va. App. 411, 418 (1998) ("Evidence is relevant if it has any logical tendency, however slight, to establish a fact at issue in the case." (quoting *Ragland v. Commonwealth*, 16 Va. App. 913, 918 (1993))). "Evidence that is not relevant is not admissible," and, subject to some exceptions, "[a]ll relevant evidence is admissible." Va. R. Evid. 2:402. One exception to Virginia Rule of Evidence 2:402 is that relevant evidence is inadmissible when "the probative value of the evidence is substantially outweighed by (i) the danger of unfair prejudice, or (ii) its likelihood of confusing or misleading the trier of fact." Va. R. Evid. 2:403(a).

However, "[w]e cannot reverse a conviction '[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'" *Lee v. Commonwealth*, 86 Va. App. 501, 523 (2026) (second alteration in original) (quoting Code § 8.01-678). "Harmless error is a legislative mandate" that "'puts a limitation on the powers of this court to reverse the judgment of the trial court.'" *Commonwealth v.*

---

[6] This Court may assume without deciding an issue to decide the case on "the best and narrowest grounds." *Commonwealth v. White*, 293 Va. 411, 419 (2017) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Swann*, 290 Va. at 196)). We have done this to hold that potential evidentiary errors were harmless. *See, e.g.*, *Smith v. Commonwealth*, 72 Va. App. 523, 542-44 (2020) (assuming without deciding that it was error to exclude evidence and holding that any error was harmless).

*White*, 293 Va. 411, 419 (2017) (emphasis omitted) (quoting *Walker v. Commonwealth*, 144 Va. 648, 652 (1926)).  "[T]o be entitled to relief, [the appellant] must demonstrate that [any] error was significant enough to merit reversal."  *Welsh v. Commonwealth*, 304 Va. 118, 140 (2025).

On "evidentiary ruling[s]" that "do[] not implicate a [c]onstitutional issue," this Court "review[s] the matter under the non-constitutional harmless error standard."  *Shaw v. Commonwealth*, 304 Va. 217, 234 (2025); *see Schmuhl v. Commonwealth*, 69 Va. App. 281, 307 (2018) ("As appellant raises a challenge related to the admissibility of evidence, '[w]e examine this claim under the standard for non-constitutional harmless error.'" (alteration in original) (quoting *Salahuddin v. Commonwealth*, 67 Va. App. 190, 211-12 (2017))).  "A non-constitutional error is deemed harmless when we 'can conclude that the error did not influence the jury or had but slight effect. . . .  [T]he evidence of guilt must be so overwhelming that it renders the error insignificant by comparison such that the error could not have affected the' outcome."  *Shaw*, 304 Va. at 234 (quoting *Commonwealth v. Kilpatrick*, 301 Va. 214, 216, 217 (2022)).  Put simply, this Court "must be able to conclude that if the error had not occurred, the jury still would have convicted the defendant."  *Id.* (quoting *Kotteakos v. United States*, 328 U.S. 750, 764 (1946)).

This analysis is "not amenable to . . . hard and fast rules."  *Welsh*, 304 Va. at 141.  In applying it to in evidentiary-based rulings, we must "consider[] the *potential* effect of the excluded evidence in light of all the evidence that was presented to the jury."  *Haas v. Commonwealth*, 299 Va. 465, 467 (2021) (emphasis added) (quoting *Commonwealth v. Proffitt*, 292 Va. 626, 642 (2016)).  This requires us to review the error in "the context of the trial" alongside the other evidence presented to the jury.  *Shaw*, 304 Va. at 235.  Accordingly, evidence that plays only a "small part in the Commonwealth's case" is more likely to be harmless.  *Lee*, 86 Va. App. at 524.

We encountered a remarkably similar circumstance in *Joffrion v. Commonwealth*, No. 2183-99-1 (Va. Ct. App. Dec. 5, 2000).[7] There, the defendant was on trial for robbery, attempted robbery, and using a firearm in the commission of a felony. *Joffrion*, slip op. at 1. The firearm used during the offenses—a .38 caliber handgun—was admitted in evidence. *Id.* at 4. Also admitted in evidence was a pellet gun "operated by $CO_2$ gas cartridges" found by police when they searched the defendant's car. *Id.* The pellet gun played no role in the commission of the offenses so, according to the defendant, admitting it into evidence was "extremely prejudicial." *Id.* at 2. The Court, instead, held that its admission was harmless. *Id.* at 5. The Court noted that "[i]t was never suggested to the jury that the pellet gun was used to commit the offenses for which [the defendant] was being tried." *Id.* at 4. And the Court emphasized the fleeting nature of the evidence when put in context, stating that "other than [a] brief description of it . . . the pellet gun was not referred to at trial in the jury's presence." *Id.* This compelled the Court to conclude that "had the pellet gun not been admitted, the verdict would have been the same," so any purported error was harmless. *Id.* at 5.

Here, any potential error in admitting the video footage and photograph depicting Lantry with the pellet rifle and pistol was harmless. This is, in part, because the pellet guns were an insignificant part in the trial. *See Lee*, 86 Va. App. at 524. At no time were the pellet guns referenced by the Commonwealth in closing arguments. *See White*, 293 Va. at 423 (finding any error to be harmless where the prosecutor did not mention the evidence in "his opening or closing statements" but instead focused on other evidence). Indeed, the Commonwealth *never* referred to the pellet guns *at any point* of the trial in the jury's presence, including its witness examinations of Van Dyke, Officer Lusk, and Asbury. The Commonwealth simply abided by

---

[7] While not binding, unpublished cases may be cited as persuasive authority. *See* Rule 5A:1(f); *see also Smith v. Commonwealth*, 78 Va. App. 371, 383 n.4 (2023).

the trial court's evidentiary ruling and did not raise the issue throughout the trial. Accordingly, it is difficult to conclude anything else than that the presence of the pellet guns in the video and photographic evidence played a "small part in the Commonwealth's case," indicating that its admission was harmless. *Lee*, 86 Va. App. at 524. Moreover, the only time the pellet guns were mentioned in the presence of the jury at trial was by Lantry himself, further indicating that such evidence was not central to the prosecution. *See Castillo v. Commonwealth*, 70 Va. App. 394, 431 (2019) (finding that error was harmless, in part, because "it was counsel for appellant who first" brought out the evidence at issue).

It is also notable that the evidence and presentation of Lantry's pellet guns is similar to the evidence and presentation of the pellet guns in *Joffrion*. Like the evidence presented in *Joffrion*, "[i]t was never suggested to the jury" in this case "that the pellet gun[s] w[ere] used to commit the offenses for which [Lantry] was being tried." *Joffrion*, slip op. at 4. And "other than [a] brief description of it . . . the pellet gun[s] w[ere] not referred to at trial in the jury's presence," which is also similar to the presentation of the pellet gun in *Joffrion*. *Id.* Accordingly, the pellet guns here played no larger role than the pellet gun did in *Joffrion*, reinforcing our conclusion that the pellet guns played only a "small part in the Commonwealth's case." *Lee*, 86 Va. App. at 524.

Finally, the Commonwealth introduced additional, overwhelming evidence that Lantry committed the offenses. The Commonwealth admitted 32 exhibits at trial, which included about 5 minutes of body-worn camera footage. This evidence showed Lantry standing in Van Dyke's driveway, without permission, and admitting to law enforcement that he believed he was entitled to break into and live in Van Dyke's home because Lantry thought it was "uninhabited" and he was "under the impression that this was a free country." The evidence further reflects that Lantry broke into Van Dyke's garage by damaging the door's locking mechanism. He then secured the garage door by screwing a wood plate onto the frame. Once inside, Lantry began moving items around the

home and throwing clothes into places they did not belong.  Lantry also left other evidence of his entry into Van Dyke's home, including but not limited to the vestiges of smoking cigarettes, paperwork that did not pertain to anyone in Van Dyke's family, and hardware and tools left on counters that were previously free of clutter.

Moreover, Lantry, by his own admission, stayed in Van Dyke's home for four days while sleeping in a sleeping bag that contained a wallet holding his ID.  The Commonwealth also presented circumstantial evidence of Lantry stealing $1,800 and a valuable coin purse from Van Dyke while squatting in his home.  This included photos of an empty Louis Vuitton box and an empty envelope that Van Dyke testified had previously contained a Louis Vuitton coin purse and approximately $1,800 in cash, respectively.  *See Lee*, 86 Va. App. at 526 (finding that an error was harmless, in part, because the Commonwealth's circumstantial evidence at trial "overwhelmingly proved the Commonwealth's case").  This theft was corroborated by Van Dyke's testimony that also indicated that Lantry also took a drill.  Lantry even admitted to having tried to pawn a watch that he took from Van Dyke's home.

Thus, like *Joffrion*—which found that "had the pellet gun not been admitted, the verdict would have been the same"—we arrive at the same conclusion in this case.  *Joffrion*, slip op. at 5.  It "plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached."  Code § 8.01-678.  Therefore, we hold that any error in admitting the evidence of Lantry possessing the pellet guns was harmless.  *Shaw*, 304 Va. at 236.

## III. CONCLUSION

For these reasons, we affirm the trial court's judgment.

*Affirmed.*